818 A.2d 1159

DARCARS MOTORS OF SILVER SPRING, INC.,

v.

Marcin BORZYM.

No. 1513, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Jan. 30, 2003.

Reconsideration Denied April 10, 2003.

20

24

---

Brent M. Ahalt (John P. Lynch and McNamee, Hosea, Jernigan, Kim Greenan & Walker, P.A., on the brief), Greenbelt, for appellant.

Lloyd J. Eisenberg (Lloyd J. Eisenberg & Associates, P.A., on the brief, Silver Spring, for appellee.

KENNEY, ADKINS, and CHARLES E. MOYLAN, Jr. (retired, specially assigned), JJ.

MOYLAN, Judge.

This appeal deals with a number of different aspects of the propriety of awarding punitive damages in a case involving the tort of conversion.

The appellee and cross-appellant, Marcin Borzym, brought suit against the appellant and cross-appellee, Darcars Motors of Silver Spring, Inc. ("Darcars") in the Circuit Court for Montgomery County. The case was tried by a jury, presided over by Judge Paul A. McGuckian, on April 2 and 3, 2001. The jury returned a verdict in favor of Borzym, awarding him compensatory damages in the amount of $4,300 on the count charging conversion. No challenge is herein being made to that verdict or that award.

With respect to the conversion, however, the jury also found that Darcars had acted with sufficient malice to warrant an award of punitive damages. After hearing additional testimony, the jury awarded punitive damages against Darcars in the amount of $100,000. Judge McGuckian subsequently granted Darcars's Motion for Judgment Notwithstanding the Verdict and/or Motion for Remittitur and reduced the amount of the punitive damage award to $25,000.

All of the issues before us, both on appeal and cross-appeal, concern the award of punitive damages. On appeal, Darcars claims

1. that the evidence was not legally sufficient to support the necessary finding of actual malice;

2. that Borzym's complaint did not adequately plead a claim for punitive damages; and

3. that the evidence of Darcars's financial condition was not legally sufficient to support the final award of $25,000 in punitive damages.

On his cross-appeal, Borzym claims that Judge McGuckian abused his discretion in reducing the punitive damages award from $100,000 to $25,000.

## Factual Background

The evidence permitted factual findings that on Friday evening, March 31, 2000, Borzym decided to purchase a 1999 BMW323i from Darcars for $26,000. He met with the finance manager of Darcars to negotiate and iron out multitudinous details surrounding the purchase. As is so frequently true, "the devil is in the details." Borzym filled out and signed that evening the following documents: 1) a credit application, 2) a purchase order, 3) a retail installment contract, 4) a supplementary agreement to a conditional sales contract, 5) an application for certificate of title, and 6) an agreement to provide accidental physical damage insurance. Borzym also gave to Darcars a cash deposit of $2,500.

Borzym was not permitted to take the BMW with him that evening, however, because he did not have the necessary information about the State Farm insurance policy that he claimed covered him. On Saturday morning, he returned to Darcars and provided the policy information to the finance manager. He then left the dealership with the BMW. On Sunday, Borzym returned to Darcars and, without incident, picked up copies of the paperwork he had previously signed.

By Monday morning, however, controversy began to develop between Borzym and Darcars about the accuracy of some of the information furnished by him, particularly information concerning his insurance coverage. In a series of telephone calls over the next several days, Darcars insisted that Borzym

come into the dealership immediately and provide accurate insurance information. Borzym kept postponing his return to the dealership, allegedly because his schedule did not permit it.

On Thursday, April 6, the BMW was repossessed for Darcars by a repossession company. Prior to the repossession, Borzym had placed in the trunk of the BMW 1) his laptop computer, valued at $1,500; and 2) a CD collection, valued at $300. Neither was returned to him. Nor did Darcars return to Borzym his $2,500 down payment. The non-return of those items was the basis for the verdict of unlawful conversion and the award to Borzym in the amount of $4,300. We reiterate that Darcars does not now challenge the legitimacy of that verdict.

### The Requirement and Definition of Actual Malice

It is well-settled Maryland law that an award of punitive damages is only permitted in a tort case if the plaintiff has proved that the tortfeasor acted with actual malice. As Judge Digges stated for the Court of Appeals in *Siegman v. Equitable Trust Co.*, 267 Md. 309, 313–14, 297 A.2d 758 (1972):

> In a tort case where punitive damages are permitted, in order to obtain such an award a plaintiff must prove actual malice.

See also *Battista v. Savings Bank of Baltimore*, 67 Md.App. 257, 274, 507 A.2d 203 (1986); *Miller Building Supply, Inc. v. Rosen*, 305 Md. 341, 348, 503 A.2d 1344 (1986); *D.C. Transit System v. Brooks*, 264 Md. 578, 287 A.2d 251 (1972); *Daugherty v. Kessler*, 264 Md. 281, 286 A.2d 95 (1972); *Associates Discount v. Hillary*, 262 Md. 570, 278 A.2d 592 (1971); *St. Paul at Chase v. Mfrs. Life Insur.*, 262 Md. 192, 278 A.2d 12 (1971); *Damazo v. Wahby*, 259 Md. 627, 270 A.2d 814 (1970).

The social policy that is implemented by an award of punitive or exemplary damages was first explained by the Court of Appeals in 1884 in *Phila., Wilm., & Balto. Railroad Co. v. Hoeflich*, 62 Md. 300, 307 (1884):

> [T]o entitle one to [punitive] damages there must be an element of fraud, or malice, or evil intent, or oppression entering into and forming part of the wrongful act. It is in such cases as these that *exemplary or punitive damages are awarded as a punishment for the evil motive or intent with which the act is done, and as an example or warning to others.*

(Emphasis supplied) (Quoted with approval in *Davis v. Gordon,* 183 Md. 129, 133, 36 A.2d 699 (1944); *Owens–Illinois v. Zenobia,* 325 Md. 420, 455, 601 A.2d 633 (1992); *Ellerin v. Fairfax Savings,* 337 Md. 216, 227, 652 A.2d 1117 (1995)).

 What has come to be the standard definition of actual malice in Maryland was that articulated by Judge Digges in *Drug Fair v. Smith,* 263 Md. 341, 352, 283 A.2d 392 (1971):

> Actual or express malice may be characterized as the performance of an unlawful act, intentionally or wantonly, without legal justification or excuse but with an evil or rancorous motive influenced by hate; the purpose being to deliberately and wilfully injure the plaintiff.

See also *Schaefer v. Miller,* 322 Md. 297, 300, 587 A.2d 491 (1991); *Henderson v. Maryland National Bank,* 278 Md. 514, 519, 366 A.2d 1 (1976); *Siegman v. Equitable Trust Co.,* 267 Md. 309, 314, 297 A.2d 758 (1972); *Battista v. Savings Bank of Baltimore,* 67 Md.App. 257, 274, 507 A.2d 203 (1986). In *Ellerin v. Fairfax Savings,* 337 Md. 216, 228, 652 A.2d 1117 (1995), the Court of Appeals added the observation that, "with regard to most types of tort actions, Maryland law has limited the availability of punitive damages to situations in which the defendant's conduct is characterized by knowing and deliberate wrongdoing."

### The Difference Between "Implied Malice" As a Rejected Standard and Implying "Malice" As a Legitimate Evidentiary Modality

The very necessity of modifying the noun "malice" with the adjective "actual" strongly suggests that there is or recently has been a definitional problem in describing the predicate for

a punitive damages award. Over the twenty year period from *Smith v. Gray Concrete Pipe Co.*, 267 Md. 149, 297 A.2d 721 (1972) through *Owens–Illinois v. Zenobia*, 325 Md. 420, 601 A.2d 633 (1992), Maryland was plagued with two different forms of malice that could, under varying circumstances, support a punitive damages award. To distinguish the two, we necessarily resorted to modifiers. The traditional malice that we have described above, which was Maryland's exclusive form of malice prior to 1972 and which is Maryland's exclusive form of malice today, we labeled "actual malice." The other, or "non-actual" malice, emanating from the *Smith v. Gray Concrete Pipe Co.* case, we called "implied malice."

As *Montgomery Ward v. Wilson*, 339 Md. 701, 728 n. 5, 664 A.2d 916 (1995) explained, "implied malice" was defined as "gross negligence involving wanton or reckless disregard" of the rights of others. *Scott v. Jenkins*, 345 Md. 21, 29 n. 3, 690 A.2d 1000 (1997), further defined it as "non-intentional conduct so reckless or wanton as to be 'grossly negligent.' " "Implied malice" did not require a "wilful or intentional injury" but "contemplate[d] conduct which [was] of an extraordinary or outrageous character." *Id.* at 30, 690 A.2d 1000. During that twenty year period, a number of Maryland cases employed, at least for non-intentional torts, that alternative standard of malice. *H. & R. Block v. Testerman*, 275 Md. 36, 338 A.2d 48 (1975); *Wedeman v. City Chevrolet*, 278 Md. 524, 366 A.2d 7 (1976); *Nast v. Lockett*, 312 Md. 343, 539 A.2d 1113 (1988).

After much criticism of "implied malice" as an alternative substantive standard for awarding punitive damages, the imminent demise of that alternative and lesser standard was foretold by the concurring opinion of Judges Eldridge, Cole, and Chasanow in *Schaefer v. Miller*, 322 Md. 297, 312–32, 587 A.2d 491 (1991). The actual death knell for "implied malice" as a substantive standard finally sounded in *Owens–Illinois v. Zenobia*, 325 Md. at 450–60, 601 A.2d 633, in 1992, at least so far as non-intentional torts were concerned. *Adams v. Coates*, 331 Md. 1, 13, 626 A.2d 36 (1993), administered the *coup de grace* to "implied malice" by insisting upon the "actual malice" standard for non-intentional and intentional torts alike.

■ The history of the rise and fall of "implied malice" as a substantive standard for punitive damages awards was deftly traced by Judge Karwacki in *Scott v. Jenkins*, 345 Md. 21, 29–34, 690 A.2d 1000 (1997). What has now been decided, at the very least, is that the malice necessary to support an award of punitive damages must arise out of tortious conduct that is intentional and not out of a tort based on negligence, even gross negligence.

The ghost of "implied malice" is so recently departed, however, that instead of using, as we might, the unadorned noun "malice" to refer to the single standard now in the field, we still feel compelled to distinguish "actual malice" from the memory of that dread something else still lurking in the near shadows.

That linguistic ghost, moreover, still rises up as a snare to analysis in yet another regard. The participial phrase "implied malice" has had two widely disparate meanings. It was for twenty years, as we have discussed, one of two substantive standards for measuring the malice necessary to support a punitive damages award. Since 1992, it is no longer that.

The notion of implied malice, on the other hand, always had, and still has, a second and very different meaning as an evidentiary device or decisional modality. The quality of malice, however it may substantively be defined, can only occasionally be proved by direct evidence. Statements by a defendant such as, "I hate the plaintiff and, out of pure spite, I intend to injure him," are rarely available as direct proof. The requisite state of mind, therefore, must frequently be proved circumstantially. From the very circumstances under which a tort is committed, we may sometimes be able to **infer** the malicious state of mind of the tortfeasor.

Or we may say, changing the direction of the decisional process, the circumstances under which a tort is committed **imply** the malicious state of mind of the tortfeasor. If the conclusion may be **inferred** from the factual predicate, the factual predicate **implies** the conclusion. The only difference is a grammatical one between the active and passive voices.

In that sense, even "actual malice" may be implied. It may be implied malice, procedurally, even if it is not "implied malice," substantively. However clear that may be to the grammarian, however, it is, to be sure, a linguistic or analytic snare.

In *Ellerin v. Fairfax Savings,* 337 Md. at 228–29 n. 8, 652 A.2d 1117, Judge Eldridge noted that the term "implied malice" has sometimes been used not to refer to the now rejected substantive standard but to refer, instead, to the evidentiary device.

> *The term "implied malice" has also been used* with regard to the availability of punitive damages *in certain types of tort cases which have allowed "malice" to be "implied" from another element of the tort. See, e.g., Montgomery Ward & Co. v. Keulemans,* 275 Md. 441, 448, 340 A.2d 705, 709–710 (1975) (upholding a punitive damages award in a false arrest case because *"malice may be implied from . . . want of probable cause* in a case of false arrest"); *Safeway Stores v. Barrack,* 210 Md. 168, 177, 122 A.2d 457, 462 (1956) (in a malicious prosecution action, *malice inferred from the want of probable cause* is sufficient to sustain a punitive damages award); *McNamara v. Pabst,* 137 Md. 468, 473, 112 A. 812, 814 (1921).

(Emphasis supplied).

In *Montgomery Ward v. Wilson,* 339 Md. at 728 n. 5, 664 A.2d 916, the Court of Appeals referred again to the use of the term "implied malice" to refer to the evidentiary device.

> *It refers not to a relationship between the elements of the malicious prosecution tort, whereby "malice" is implicit in the other elements of the tort, but to the fact that a jury is permitted to infer the malice required to establish the tort from proof of lack of probable cause. Thus, the concept of "implied malice" describes a method of proof,* rather than a particular mental state. *The term "inferred malice" would probably convey this concept more accurately.*

(Emphasis supplied).

Precisely because they carry the same linguistic label, we must be careful to distinguish the former substantive

standard from the evidentiary device. The distinction is critical because, although "implied malice" as a substantive standard for justifying a punitive damages award is now dead, the implying of malice as an evidentiary device or decisional modality is very much alive and well. "Actual malice," the only remaining substantive standard, may, as a mode of proof, be inferred from predicate circumstances; to wit, the predicate circumstances **imply** the "actual malice."

The only reason, other than to avoid confusion with the late substantive standard, that we do not attach to "actual malice" the past participle **"implied"** is that when "malice" is the object of the verb and the sentence is in the passive voice, proper linguistic usage dictates using the past participle "inferred" instead. Thus, even after *Owens–Illinois v. Zenobia*, we may go on **implying and inferring** "actual malice" just as we have always done. When we have done so, however, the proper participial modifier should be **"inferred."** On the other hand, to mix up or confuse **imply** and **infer** is simply a common solecism and the intended meaning is not in any way changed.

Maryland has consistently recognized the validity of allowing "actual malice" to be **inferred from,** to wit, to be **implied by,** circumstantial evidence. In *McClung–Logan v. Thomas*, 226 Md. 136, 148, 172 A.2d 494 (1961), the Court of Appeals clearly stated:

> *Malice, fraud, deceit and wrongful motive are oftenest inferred* from acts and circumstantial evidence. *They* are seldom admitted and *need not be proved by direct evidence.*

(Emphasis supplied).

The fullest exposition of the legitimacy of this evidentiary device is that by Judge Levine in *Henderson v. Maryland National Bank*, 278 Md. 514, 520, 366 A.2d 1 (1976):

> *Appellant points to no direct evidence of an evil motive, nor,* as Maryland National concedes *is he required to produce such proof to establish actual malice.* Although utterances reflecting personal animosity may well be the most direct proof of actual malice, we have never held them to be

the exclusive means by which that requirement may be met. In the commercial sphere, at least, where an impersonal relationship is more likely to prevail, *such emotions as anger or spite* are not always vented in a direct manner, and *not infrequently find their expression in the facts and circumstances surrounding the tortious conduct.* "Malice, fraud, deceit and wrongful motive are oftenest inferred from acts and circumstantial evidence. They are seldom admitted and need not be proved by direct evidence." *Our inquiry, then, narrows to the question whether appellant presented such facts as would permit the jury to infer that Maryland National acted with actual malice,* that is, whether there was sufficient circumstantial evidence of actual malice to warrant submission of the issue to the jury.

(Emphasis supplied).

In the landmark concurring opinion of Judges Eldridge, Cole, and Chasanow in *Schaefer v. Miller,* 322 Md. at 326–27, 587 A.2d 491, it was observed:

*Actual malice,* being a state of mind, *can obviously be inferred from other facts,* such as statements or actions which clearly indicate ill will.

(Emphasis supplied).

In *Hamilton v. Ford Motor Credit Co.,* 66 Md.App. 46, 65, 502 A.2d 1057 (1986), Judge Bloom stated for this Court:

*Actual malice may be inferred from circumstantial evidence.* Our inquiry, therefore is *whether there was evidence from which the jury could infer* that the cross-appellants acted with actual *malice.* We find *there was evidence adduced from which the jury could infer* that FMCC's representatives harbored *actual malice* toward Verna.

(Emphasis supplied). See also *Battista v. Savings Bank of Baltimore,* 67 Md.App. 257, 274, 507 A.2d 203 (1986) ("Actual malice may, of course, be inferred from circumstantial evidence.").

### The Tort of Conversion May Serve As a Predicate From Which to Infer "Actual Malice"

It is also a well-settled principle of law that the tort of conversion can serve, and frequently has served, as a launching pad for punitive damages. As the resolution of the "actual malice" versus "implied malice" controversy has made clear, the presence of malice is not necessarily inherent in the commission of a conversion, and a finding of malice, therefore, does not automatically follow from a finding that a conversion occurred. As will be examined in more detail, however, the circumstances surrounding the conversion and the manner in which it was committed frequently provide a factual predicate from which actual malice can be, though it need not be, inferred.

The Court of Appeals affirmed awards of punitive damages arising from the tort of conversion in *McClung–Logan v. Thomas*, 226 Md. 136, 148–49, 172 A.2d 494 (1961), and *Henderson v. Maryland National Bank*, 278 Md. at 519–23, 366 A.2d 1. On three other occasions, the Court of Appeals entertained the theoretically legitimate possibility of a conversion's giving rise to an award of punitive damages but held that the circumstances under which the conversion was committed did not amount to a *prima facie* case of actual malice. *Siegman v. Equitable Trust Co.*, 267 Md. 309, 314, 297 A.2d 758 (1972); *Food Fair Stores v. Hevey*, 275 Md. 50, 53–57, 338 A.2d 43 (1975); *K & K Management v. Lee*, 316 Md. 137, 174–79, 557 A.2d 965 (1989).

This Court affirmed a punitive damages award in a case of conversion in *Hamilton v. Ford Motor Credit Co.*, 66 Md.App. 46, 65–66, 502 A.2d 1057 (1986). On three other occasions, this Court entertained the theoretically legitimate possibility of a conversion's giving rise to an award of punitive damages but held that the circumstances under which the conversion was committed did not, as a matter of law, amount to a *prima facie* case of actual malice. *Parlett Ford, Inc. v. Sosslau*, 19 Md.App. 320, 326–28, 311 A.2d 443 (1973); *Lawrence v. Graham*, 29 Md.App. 422, 428–29, 349 A.2d 271 (1975); *Battista v.*

*Savings Bank of Baltimore,* 67 Md.App. 257, 274–75, 507 A.2d 203 (1986).[1]

1 Dan B. Dobbs, *The Law of Torts* (2001), § 67, p. 152, points out that some, but not all, conversions will permit an award of punitive damages.

Although the rules for allowing punitive damages may be expressed in many ways, the general principle is that *punitive damages are permissible* only *when the defendant has engaged in serious misconduct coupled with a* reckless or *malicious state of mind. Some conversion cases fall into this category and permit the award of punitive damages.*
(Emphasis supplied).

### The Tort of Conversion: The Physical Acts

█ Because the circumstances under which the tort of conversion occurs may sometimes, but do not always, serve as

---

1. In *Staub v. Staub,* 37 Md.App. 141, 146–47, 376 A.2d 1129 (1977), this Court simply affirmed the discretionary decision of the trial judge not to award punitive damages, even though a *prima facie* case of malice may have been established. ("Even where such malice is established, the award of punitive damages lies within the discretion of the trier of fact."). See also *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 533, 366 A.2d 7 (1976) ("It should be emphasized that once a legal basis for punitive damages is established, whether or not such damages shall be awarded lies within the discretion of the trier of fact."). Under the circumstances, we had no need to decide, and did not decide, whether a *prima facie* case of malice had, as a matter of law, been established.

In *Bender v. Bender,* 57 Md.App. 593, 597–98, 471 A.2d 335 (1984), this Court also affirmed a trial judge's discretionary denial of punitive damages, notwithstanding his conclusion that the conversion constituted a "rather egregious wrong."

The trial judge in this case found that Penelope Bender committed a "rather egregious wrong against Mr. Bender," but concluded that the totality of the circumstances warranted an allowance of interest rather than punitive damages. The court's conclusion was supported by a detailed fact finding which was supported by substantial evidence in the record. His decision, therefore, is not clearly erroneous and will not be disturbed.

Indeed, in terms of a *prima facie* case, as opposed to a holding that discretion had not been abused, *Bender v. Bender,* 57 Md.App. at 602, 471 A.2d 335, also observed that the trial judge "had substantial evidence that ... Mrs. Bender's actions could be found to violate the criminal laws of this state."

a factual predicate from which "actual malice" may be inferred, it behooves us to look more closely at the essential characteristics of the tort itself. Deferring for the moment a comparison of the intent element of the tort of conversion and the *mens rea* of theft, we find enlightening the similarity between the physical acts of the tort and the *actus reus* of the crime. Although the tort, unlike the crime, is limited to personal property, the physical acts that constitute the tort are also physical acts that satisfy the definition of the crime.

As early as 1909, the Court of Appeals in *Merchants' Bank v. Williams*, 110 Md. 334, 351–52, 72 A. 1114 (1909), referred to the two-pronged character of the tort.

Conversion, in the sense of the law of trover, consists either in the appropriation of the property of another, or in its destruction, or in exercising dominion over it in defiance of the owner's rights, or in withholding the possession from him under an adverse claim of title, and all who aid, command, assist or participate in the commission of such unlawful acts are liable.

See also *Hammond v. DuBois*, 131 Md. 116, 153, 101 A. 612 (1917).

With respect to the tort, *Interstate Insurance Co. v. Logan*, 205 Md. 583, 588–89, 109 A.2d 904 (1954), has explained:

A "conversion" is any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it.

*Kalb v. Vega*, 56 Md.App. 653, 665, 468 A.2d 676 (1983), stated:

Conversion has been generally defined as the wrongful exercise of dominion by one person over the personal property of another.

Whereas the tort of conversion was once thought to require, like common law larceny, a trespassory taking and an asportation, the scope of its prohibition is now deemed to be, as with statutory theft, much broader. In *Kalb v. Vega*, 56 Md.App. at 666, 468 A.2d 676, Judge Wilner explained for this Court:

Initially, the Court of Appeals spoke of conversion as the wrongful *taking or asportation of a chattel* with the intent by the taker to appropriate it to his own use. *See Harker v. Dement,* 9 Gill 7, 17 (1850). Later cases, however, have made clear that *the gist of the tort is* not necessarily the manner of acquisition of the property by the defendant, but rather his *wrongful exercise of dominion over it. See Kirby v. Porter,* 144 Md. 261, 125 A. 41 (1923); *Saunders v. Mullinix,* 195 Md. 235, 72 A.2d 720 (1950). *That may involve nothing more than the improper withholding of the property from the rightful owner ....*"

(Emphasis supplied).

In *Saunders v. Mullinix,* 195 Md. 235, 240, 72 A.2d 720 (1950), the Court of Appeals had earlier noted that the tort of conversion covers not only the initial acquisition of the personal property of another but also the subsequent exerting of unauthorized control over the property:

> [T]he gist of a conversion is not the acquisition of the property by the wrongdoer, but the wrongful deprivation of a person of property to the possession of which he is entitled. Nor need there exist a forcible dispossession of property to constitute an act of the defendant a conversion.

See also *Lawrence v. Graham,* 29 Md.App. 422, 427–28, 349 A.2d 271 (1975).

Professor Dobbs, *op. cit.,* at § 64, p. 136, points out that the standard definition of conversion is the one first articulated by Thomas M. Cooley, *Law of Torts* 448 in 1878:

> Any distinct act of dominion, wrongfully exerted over one's property in denial of his right or inconsistent with it.

The *Maryland Civil Pattern Jury Instructions* (2d ed.1984) has broken the instruction as to conversion down into two separate instructions so as to cover two distinct modalities. MPJI 16:4 deals with an unauthorized initial taking.

> A conversion occurs when a person without authority or permission intentionally [takes the personal property of

another] [deprives another of possession of personal property].

MPJI 16:5 deals with a wrongful detention.

A wrongful keeping takes place when a person who rightfully obtained possession of personal property of another [refuses on proper demand to give back the property] [[uses] [disposes of] the property in any unauthorized manner].

These definitions of the physical acts that constitute the tort of conversion could as readily be describing the *actus reus* of the crime of theft. In terms of its *actus reus*, the core provision of the consolidated theft law is Maryland Code, Art. 27, § 342(a), which provides in pertinent part:

*Obtaining or exerting unauthorized control.*—A person commits the offense of theft when he willfully or knowingly obtains control which is unauthorized or exerts control which is unauthorized over property of the owner. . . .

Section 340(g)(1) defines "obtain":

(g) "Obtain" means:

(1) In relation to property, to bring about a transfer of interest or possession, whether to the offender or to another. . . .

Section 340(d) defines "exerts control":

"Exerts control" includes but is not limited to the taking, carrying away, appropriating to one's own use or sale, conveyance, transfer of title to, interest in, or possession of property.

The key *actus reus* of theft is unquestionably an instance of the tort of conversion in its most virulent form. Dobbs, § 65, p. 138, also makes clear that an act of theft, albeit not necessary to a conversion, is a classic instance of a conversion.

As the Restatement recognizes, *conversion can be committed in many different ways. A taking of the chattel by a thief is a simple and core example.*

(Emphasis supplied). As *Saunders v. Mullinix*, 195 Md. at 240, 72 A.2d 720, also made clear:

A conversion may consist of a wrongful, tortious or unlawful taking of property from the possession of another by theft.

This overlap between the crime and the tort makes eminently good sense because a crime against property is *ipso facto* a tort against the property owner. Before the passage of the Consolidated Theft Act in 1978, the pre-existing crimes of both embezzlement and larceny after trust regularly described the situation wherein the defendant, after having lawfully acquired a chattel in the first instance, was thereafter guilty of the **unlawful conversion** of that chattel to his own use. Just as assault and battery is both a crime and a tort, so too is the unlawful conversion of someone else's property. The victimized owner may, of course, seek to bring criminal charges for theft, but may also seek civil redress by suing for the tort of conversion.

In this case, the physical acts that constituted the conversion did not involve a trespassory taking or an unlawful asportation in the first instance. Accepting, as we must and as the jury found, Borzym's best version of the evidence, Borzym voluntarily handed over to Darcars the $2,500 in cash representing his down payment on the BMW.[2] By the same token, the laptop computer and the CD collection were simply in the trunk of the BMW when it was lawfully repossessed.[3]

---

**2.** His testimony in this regard was, coincidentally, corroborated in part by the testimony of his father and by the purchase order made out by Darcars.

**3.** With respect to the laptop computer and the CD collection, on the other hand, it may well be that there was an actual trespassory taking and an asportation. As Professor Dobbs, *op. cit.*, § 62, pp. 128–29, points out, "[T]he defendant who intentionally seizes the plaintiff's automobile intends to seize its contents, even if his only purpose is to repossess the car." *Jones v. Petty*, 577 So.2d 821 (La.App.1991). In this case, however, it makes no difference to the tort of conversion, just as it would make no difference to the statutory crime of theft, whether the unlawful appropriation of the personal property of another was

The physical gravamen of the conversions in this case consisted, rather, of the retaining and the continued exerting of dominion and control over both the cash and the other personal property to the detriment of Borzym, the rightful owner. When Borzym demanded the return of his property, he was disdainfully told to "get lost" or to "call his attorney."

Q. And what was discussed in that meeting?

A. I came in. I asked why was my car repossessed.

Q. And what was the response?

A. They said, "Well, because you didn't pay anything, and we took your car away."

Q. Just go ahead and tell us what you said and what happened in the rest of the conversation.

A. Well, I said, I paid the money, and I expect to have my car back; and either I want my money or I want my—*I want all my money and my belongings if you are going to keep the car.*

Q. *How much money did you ask them for?*

A. *$2,500.*

Q. Did you tell them about anything in the car?

A. Yes, I did.

Q. *What was in the car?*

A. *My laptop, my CDs.*

Q. *And what was their response?*

A. *Forget about it. Get out of here. I mean, call your attorney.*

Q. And did they say where the car was?

A. Yes. they said the car was in a different lot. They don't have the car.

Q. *Anything else said about your property in the car?*

accomplished by an initial taking and asportation or by a subsequent unlawful retention.

A. *Just forget about it, just get out of the office, get lost.* (Emphasis supplied).

The only other physical aspect of the tort worthy of discussion is the extent or seriousness of the deprivation suffered by the victim. The degree of deprivation is what traditionally separated the tort of conversion, historically redressed by the action of trover, and the lesser tort of trespass. Professor Dobbs, *op. cit.*, § 65(6), pp. 144–45, discusses this difference:

When the defendant uses the plaintiff's chattel or interferes with it but does not damage it or dispossess the plaintiff for any significant time, rules provide little assistance. If the use or interference is substantial enough, the court may find a conversion. If it is not, the court will reject a conversion approach and the defendant will be liable at most for a trespass to chattels. In this setting the defendant's intent or bad faith becomes important, along with the duration of the interference. The defendant who uses your desk to write a letter is probably not a converter even if you have told him not to do so; if he uses it for months and claims ownership, he probably is.

As already indicated, even a minor trespass may warrant liability for conversion if, in the course of the trespass, substantial though unintended harm results to the chattel.

In *Staub v. Staub,* 37 Md.App. at 143–46, 376 A.2d 1129, this Court discussed at length the difference in degree between a more serious conversion of property and a less serious trespass to property. In the case before us, neither the $2,500 nor the laptop computer nor the CD collection was ever returned and the deprivation was, therefore, maximal.

### The Tort of Conversion: The Mental Elements

It is with regard to the respective mental elements that a critical difference appears between the crime of theft and certain less malevolent instances of the tort of conversion. It is exceedingly difficult, if not impossible, to hypothesize a theft that is not also a conversion. On the other hand, there are many conversions that do not amount to theft. A close

comparison of the respective mental elements may be valuable, particularly with respect to the aggravating element of "actual malice."

## A. The Tort of Conversion, With or Without Malice, Does Not Require An *Animus Furandi*

As we compare the mental elements of 1) the tort of conversion without "actual malice," 2) the tort of conversion with "actual malice," and 3) the crime of theft, one aspect of the *mens rea* of theft turns out to have no significance for our analysis of punitive damages in conversion cases. That immaterial aspect of the theft *mens rea* is the requirement of an *animus furandi.* Section 342(a), (b), and (c) all require that the alleged thief have "the purpose of depriving the owner of the property." Section 340(c), in turn, defines "deprive."

"Deprive" means to withhold property of another:

(1) Permanently; or

(2) For such a period as to appropriate a portion of its value; or

(3) With the purpose to restore it only upon payment of reward or other compensation; or

(4) To dispose of the property and use or deal with property so as to make it unlikely that the owner will recover it.

Although the tort of conversion requires no such *animus furandi,* the intentional nature of the tort would nonetheless, were it required to do so, almost inevitably satisfy the extremely watered-down definition of theft's *animus furandi.* As *Keys v. Chrysler Credit Corp.,* 303 Md. 397, 414, 494 A.2d 200 (1985), points out, "conversion is an intentional tort" and requires "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." When, therefore, the deprivation is, in its extent and duration, significant enough to qualify as the tort of conversion, rather than as a mere trespass, such an intentional deprivation would almost invariably satisfy any *animus furan-*

*di* requirement. In that respect, the tort and the crime remain essentially parallel.

## B. Conversion Is an Intentional Tort

As we have noted above, *Keys v. Chrysler Credit Corp.*, 303 Md. at 414, 494 A.2d 200, held squarely that "conversion is an intentional tort." The required intent is the "intent to exercise a dominion or control over" the property of another. Professor Dobbs, *op. cit.*, § 62, pp. 128–29, elaborates on the intentional quality of the tort:

> Conversion is an intentional tort. There is no such thing as a conversion by accident. The defendant may accidently damage property and may be liable for doing so if he is negligent or if the facts warrant imposition of strict liability; but negligent damage, destruction, or taking without an intent to affect the chattel at all is not a conversion.

> The intent required is the defendant's intent to exercise control of or dominion over the goods, no more. As in other cases, intent is shown either by the defendant's purpose to affect the goods in question or by his substantial certainty that they will be affected.

> The intent required to show conversion is exactly analogous to the intent required to prove a trespass to land. In neither case is the defendant's bad motive or good faith ordinarily relevant except on the question of punitive damages.

The verdict in this case that the tort of conversion was committed thereby established that the tortious wrongdoing now in issue was intentional and was not an inadvertent or negligent oversight.

The significance of this intentional mental element to the issue of actual malice was noted by Judge Eldridge in *Ellerin v. Fairfax Savings*, 337 Md. 216, 233, 652 A.2d 1117 (1995).

> When a tort was committed willfully and with knowledge of the wrong, instead of by ignorance, mistake or negligence, this Court very early held that it was committed with the requisite "bad motive" to allow punitive damages. Thus

in *Ridgely v. Bond & Wife*, 17 Md. 14, 20–21, 22–23 (1861), an action of trespass *quare clausum fregit*, this Court agreed that one who "may innocently appropriate his neighbor's property, supposing it to be his own," is liable only for compensatory damages, but when he "does so, knowing it not to be his own, he is liable in vindictive damages." ...

More recently, this Court has reaffirmed the principle that punitive damages liability must be based on the defendant's conscious wrongdoing.

## C. "Claim of Right" and "Honest Belief" Defenses

It is another mental aspect of the crime of theft (actually, two affirmative defenses based on a defendant's mental perception), however, that looms large in deciding which tortious conversions have been committed with actual malice and which have not. In the consolidated theft law, § 343(c)(1) and (2) expressly provide:

It is a defense to the offense of theft that:

(1) The defendant acted under a good faith claim of right to the property involved;

(2) The defendant acted in the honest belief that he had the right to obtain or exert control over the property as he did[.]

When either of those closely related defenses could be successfully asserted at a criminal trial for theft, the tort of conversion under the same circumstances has invariably been held, as a matter of law, to have been committed without the actual malice necessary to support an award of punitive damages. As to the distinction between the closely related "claim of right" and "honest belief" affirmative defenses, see Moylan, *Maryland's Consolidated Theft Law and Unauthorized Use* (MICPEL, 2001), § 12.3, p. 85:

In trying to get a firm grip on the precise nature of the claim of right defense, the key word that emerges is "claim" in the sense of a formal legal action or "claim" that has already been or could readily be filed in court. Almost always involved is some sort of prior commercial or other

legal relationship between the parties, with the property in question being either the subject of that relationship or at least a pawn in a contest growing out of that relationship. *Where the claim of right defense is properly interposed, the property has generally not been taken by stealth or in ignorance as to whom it belongs; the conversion, rather, is more frequently by way of a bold and public assertion of a superior right to the property.* Whether the case law will ultimately treat it as such is not yet certain, but the claim of right defense has every characteristic of a true affirmative defense with all the attendant procedural consequences.

The honest belief defense, by contrast, is more a simple negation of a criminal *mens rea*, frequently the denial of scienter based on a defendant's ignorance or misunderstanding of key circumstances. The legally adequate honest belief defense in *Sibert* is a case in point. "[I]t is clear that this defense operates to negate the *mens rea* for the offense of theft, thereby providing a total defense." The defendant Sibert testified that he had purchased the stolen doors in issue in the honest belief that they were not stolen. The goods were purchased from one who had just attended an auction. The purchase price represented a good bargain but not a ridiculously good bargain. "[T]he above makes clear that Sibert produced evidence sufficient to generate a jury issue as to the honest belief under Sect. 343(c)(2)." (Emphasis supplied).

The leading Maryland case on the "claim of right" defense is *Sibert v. State*, 301 Md. 141, 482 A.2d 483 (1984). *Sibert* pointed out, 301 Md. at 147–48, 482 A.2d 483, that "the 'claim of right' defense in Maryland originated in *Saunders v. Mullinix*," *supra*.

According to this legislative commentary, the claim of right defense in Maryland originated in *Saunders v. Mullinix*, 195 Md. 235, 72 A.2d 720 (1950). The *Saunders* Court, in referring to this defense in *dicta*, stated:

It is a generally accepted rule in criminal prosecutions that one who either takes or retains the property of another without the latter's consent for a debt which he in

good faith claims to be due him by the owner of the property is not guilty of larceny, because the existence of the debt or the *bona fide* belief in its existence shows a lack of felonious intent in the taking or detention of the property.

*Id.* at 240, 72 A.2d at 722. We note parenthetically that *Saunders was a civil conversion case, and the court discussed the claim of right defense by contrasting it to the tort of conversion.*

(Emphasis supplied).

The availability of such a defense, *Saunders v. Mullinix* established, would not negate the tort of conversion generally, although it would negate the aggravating circumstance of "actual malice." In *Keys v. Chrysler Credit Corp.,* 303 Md. at 414, 494 A.2d 200, Judge McAuliffe explained the difference between the required intent and the irrelevant improper motive.

*Conversion is an intentional tort, but the intent that must be shown does not necessarily involve an improper motive.*

The intent required is not necessarily a matter of conscious wrongdoing. It is rather an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights. A purchaser of stolen goods or an auctioneer who sells them in the utmost good faith becomes a converter, since the auctioneer's acts are an interference with the control of the property. A mistake of law or fact is no defense. "Persons deal with the property in chattels or exercise acts of ownership over them at their peril," and must take the risk that there is no lawful justification for their acts. W. Keeton, *Prosser & Keeton on Torts,* § 15.

Thus, *if Appellant is able to prove a conversion she will be entitled to appropriate damages, even though the jury may fail to find an improper motive* necessary to sustain an action for malicious use of process.

(Emphasis supplied).

All six of the Maryland cases that have held that the tort of conversion was committed, as a matter of law, without "actual

malice" were cases in which plausible claims of right or entitlement were asserted and were essentially uncontradicted. They were claims that would have qualified, had the defendants been tried for theft, as "claim of right" or "honest belief" defenses under § 343(c)(1) or (3). In *Siegman v. Equitable Trust Co.*, 267 Md. 309, 297 A.2d 758 (1972), a defendant bank was openly attempting to recover a debt from one of its depositors. Judge Digges explained, 267 Md. at 316, 297 A.2d 758:

> Here, all the record indicates is that the bank, on a mistaken understanding of the law, attempted to satisfy out of a joint checking account the individual debt of Mr. Siegman created by his indorsement on a forged check. There is no evidence that the bank either converted his funds or refused to honor his checks out of evil motives intended to injure the Siegmans. Although it acted so as to damage the appellants, the bank was motivated by self interest rather than by a malicious desire to harm the appellants.... Although the bank may not at all times act with charity for all, in this case it acted with malice toward none.

The holding of the Court of Appeals was clear:

> *[W]here an act, though wrongful, is committed in the honest assertion of a supposed right and without any evil intention, there is no ground on which punitive damages can be awarded.*

267 Md. at 314, 297 A.2d 758 (emphasis supplied).

*Food Fair Stores v. Hevey*, 275 Md. 50, 338 A.2d 43 (1975), involved a dispute between the Food Fair Stores and two of its employees over their entitlement to "money allegedly due them under that company's 'Incentive Bonus and Retirement Plan.'" 275 Md. at 51, 338 A.2d 43. Judge Levine held for the Court of Appeals:

> Furthermore, when the decision to deny benefits here was made in May 1970, 20 months prior to this Court's decision in *Greeley, Food Fair believed itself legally justified*, since the weight of authority in other jurisdictions tended to uphold anti-competitive clauses in incentive and

bonus plans.... *It has long been recognized in Maryland that where an act, though wrongful in itself, is committed in the honest assertion of a supposed right or in the discharge of duty, or without any evil or bad intention, there is no ground on which punitive damages can be awarded.*

275 Md. at 56, 338 A.2d 43 (emphasis supplied).

In *K & K Management v. Lee,* 316 Md. at 174–79, 557 A.2d 965, the Court of Appeals held that, notwithstanding the defendants' liability for the tort of conversion, there was insufficient evidence of "actual malice" to support an award of punitive damages. The entire litigation grew out of a commercial dispute between the defendant management of a motel and the plaintiffs with whom the management had contracted to run a restaurant in the motel.

*Parlett Ford, Inc. v. Sosslau,* 19 Md.App. 320, 311 A.2d 443 (1973), involved a contractual dispute between an automobile owner and an auto repair shop over the right of the repair shop to hold the automobile until, in its judgment, the repair bill had been fully paid. In *Lawrence v. Graham,* 29 Md.App. 422, 349 A.2d 271 (1975), there was a rancorous dispute between the purchaser and the seller of an automobile and the repossession of the automobile by the seller was a skirmish in that battle over legal ownership. Judge Mason, 29 Md.App. at 429, 349 A.2d 271, spoke for this Court.

Under the circumstances here, *Lawrence seized the Cadillac under an honest but mistaken assertion of right. Therefore, punitive damages should not have been awarded* under any theory since malice was totally lacking in either form, actual or implied.

(Emphasis supplied).

*Battista v. Savings Bank of Baltimore,* 67 Md.App. 257, 507 A.2d 203 (1986), was also a case arising out of a contractual dispute between the purchaser of an automobile and the bank to which monthly payments were due. There had been a number of late payments that had been accepted before the ultimate repossession of the automobile by the bank. The key

question was whether the bank, by accepting late payments on a number of occasions, had waived its right to repossess when a subsequent payment was not timely made. Judge William Adkins wrote for this Court, 67 Md.App. at 275, 507 A.2d 203:

> *The Bank was wrong in its legal conclusion* that it was entitled to repossess the car, or at least it was permissible for a jury so to decide. *It could,* however, *have reached that conclusion on a mistaken but good faith assumption that the law as to waiver was other than we have held it to be.*

(Emphasis supplied). We held, as a matter of law, that actual malice had not been proved and that a punitive damage claim had properly been taken away from the jury.

 As these cases all illustrate, if a defendant, in a criminal trial for theft, would have a valid "claim of right" or "honest belief" defense, a similarly situated civil defendant would also have a valid defense against a claim that his tort of conversion had been aggravated by "actual malice" so as to support an award of punitive damages.

If the jury in this case 1) had found that Darcars had committed the tort of conversion in repossessing the BMW and 2) had the award of punitive damages been based on that repossession and nothing else, the six cases discussed above would have given Darcars a very plausible argument that a *prima facie* case of actual malice had, as a matter of law, not been established. That, however, was not what the jury found in this case.

### Sufficiency of the Evidence To Permit a Finding of Actual Malice

Darcars does not now question the submission of the issue of conversion to the jury. Both in brief and in oral argument, Darcars concedes the sufficiency of the evidence to prove the conversion of both 1) the $2,500 down payment and 2) the laptop and CD collection with their combined value of $1,800. The finding of actual malice and the consequential award of punitive damages in this case was not predicated on Darcars's

repossession of the BMW. That repossession was not unlawful. Indeed, summary judgment was granted prior to trial in favor of Darcars on the count charging unlawful repossession. The malice that supported the punitive damages award was manifested by Darcars's conversion of Borzym's cash down payment, laptop computer, and CD collection, and on that conversion alone. With respect to that conversion, moreover, we note here as the Court of Appeals noted in *Henderson v. Maryland National Bank*, 278 Md. 514, 519–20, 366 A.2d 1 (1976):

> In stipulating that it was guilty of conversion, Maryland National has effectively conceded that it acted intentionally and without legal justification.

In that case, the defendant Maryland National Bank acknowledged that, because of a series of clerical errors, its repossession of the plaintiff's automobile constituted a tortious conversion. Arguing that the error arose out of a complicated dispute over one arguably late payment, the bank denied any actual malice. The Court of Special Appeals agreed with the bank and vacated the award of punitive damages to the plaintiff. The Court of Appeals, in turn, reversed this Court and held that, based on a heated telephone exchange between a bank employee and the plaintiff, there was a genuine jury issue as to actual malice.

> According to the testimony presented by appellant, the Hendersons' final telephone conversation with a bank employee would have revealed the history of appellant's travails, including his contacts with other employees whom he identified. In addition, the employee knew that the Hendersons claimed to have mailed the photocopy of the cancelled check as requested and that they were persisting vehemently in their assertion that they had made full payment. The final conversation ended abruptly when the employee asked, " 'Are you going to bring your records down here and prove you paid for your car?' " *Mrs. Henderson flatly refused and hung up the phone. With that, the car was summarily repossessed.* No effort was

made to contact the other employees, nor was any warning given the Hendersons.

Under all the circumstances reflected by appellant's evidence, a reasonable and probable inference arose that the purpose of the repossession was not, as argued by appellee, to obtain payment on behalf of the bank. Instead, *an inference arose that the employee, provoked at appellant's angry refusal to bring the records from Alexandria to College Park, repossessed the car* to force production of the records or, far worse, *to punish him for his refusal.*

278 Md. at 523, 366 A.2d 1 (emphasis supplied).

We can see no meaningful distinction between the bank employee's response in that case of "Are you going to bring your records down here and prove you paid for the car?" and Darcars's employee's response in this case to Borzym's request for the return of his cash down payment and other belongings, "Forget about it. Get out of here. Call your attorney. Get lost."

Indeed, in *McClung–Logan v. Thomas,* 226 Md. 136, 149, 172 A.2d 494 (1961), the finding of actual malice was based upon the permissible inference that the seizure of the plaintiff's tractor had been motivated by the defendant's having been "provoked with [plaintiff's] numerous requests" and having "determined to put a stop to the complaints by seizing the tractor."

There was ample evidence, both factual and circumstantial, from which a jury could find that appellant acted wilfully, wantonly, wrongfully, and maliciously in utter disregard of appellee's rights. *It was a reasonable and proper inference that appellant became provoked with appellee's numerous requests that the defective condition of the tractor be corrected and that it determined to put a stop to the complaints by seizing the tractor* and forcing the appellee to sign a release of all claims that he might have.

(Emphasis supplied).

In *Hamilton v. Ford Motor Credit Co.,* 66 Md.App. 46, 502 A.2d 1057 (1986), a credit company repossessed a truck be-

cause of a late payment and then refused to permit the buyers to redeem it. The credit company was found to have committed a tortious conversion. In affirming an award of punitive damages, Judge Bloom pointed out for this Court, 66 Md.App. at 65–66, 502 A.2d 1057, that the required actual malice need not be aimed at the buyer, the direct victim of the conversion, but may be directed at a co-buyer.

Cross-appellants correctly point out that there was no evidence indicating malice toward Sharon, the party entitled to recover for the conversion. Malice toward her, however, is not essential to recovery of punitive damages. *It is enough that a tort was committed and that the tortious conduct was found to have been motivated by malice. Punitive damages are awarded not as compensation to the victim of tortious conduct, but as punishment for the malice that motivated the tort.* It may be a rare case in which a tortfeasor will wrong one person out of malice toward another, but this is such a case.

(Emphasis supplied). The actual malice directed toward the co-buyer, in turn, was inferrable from the "excessively rude and offensive conduct" toward her by one of the employees of the credit card company.

In this case, Darcars never even asserted, let alone offered plausible evidence, that it had any "claim of right" or "honest belief" with respect to the $2,500 cash down payment, the laptop computer, or the CD collection. Rather than make any argument that it was entitled to retain some or all of the down payment, Darcars's only position with respect to it was that it had never received such a down payment. With evidence to support its finding, the jury found otherwise.

With respect to the laptop computer and the CD collection, Darcars offered not one word of testimony with respect to those items. Darcars was apparently so disdainful of the claim that it offered no defense whatsoever as to it. All we have, through the testimony of Borzym, is the collective response of Darcars's financial services manager and two other employees, when requested by Borzym to return his

cash, his laptop, and his CD's, "Forget about it. Get out of here. Call your attorney. Get lost."

Those facts would be legally sufficient to constitute a *prima facie* case of theft itself. A conversion of that variety, without the ameliorating benefit of what in theft law would be the defense of either "claim of right" or "honest belief," qualifies for what *Scott v. Jenkins,* 345 Md. at 33, 690 A.2d 1000, described as a "sense of conscious and deliberate wrongdoing," a "wrongful motive," an "intent to injure," to wit, "actual malice." We hold that the evidence was, therefore, legally sufficient to permit the jury to infer that the conversion was motivated by such actual malice. The award of punitive damages was not improper.

### There Is No Correlation Between The Burden of Persuasion and The Burden of Production

The only other argument that the appellant makes with respect to the legal sufficiency of the evidence is an argument that turns out to have nothing to do with legal sufficiency. Darcars quite correctly notes that *Owens–Illinois v. Zenobia,* 325 Md. 420, 465–69, 601 A.2d 633 (1992), raised the burden of persuasion for proving punitive damages from the level of a bare preponderance of the evidence to the level of the evidence's being clear and convincing. Darcars then ritualistically repeats and intones that litany of the "clear and convincing burden" in virtually every other sentence, as if that solemn incantation will produce some emasculating effect on Borzym's burden of production on the issue of malice. Whatever the burden of persuasion was as to malice, however, it had no effect at all on the burden of production, which is our only concern.

Persuasion involves convincing a jury, as a matter of fact, to varying levels of certainty. Production, by contrast, involves some minimal evidence of a proposition, as a matter of law. The minimal legal requirement never changes, even if the burden of persuasion as to that proposition veers wildly upward or downward.

▮▮▮▮▮▮▮ Reserving the possibility of a rare exception in some hypothetical case in which scientific or mathematical probabilities are part of expert testimony, there is simply no correlation between the burden of persuasion and the burden of production. To raise or to lower the burden of persuasion has no impact at all on the burden of production. A burden of persuasion is simply a verbal formula by which the law attempts to communicate to lay jurors some sense as to the degree of certainty they should feel before returning various types of verdicts. In his concurring opinion in *In re Winship,* 397 U.S. 358, 368–73, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), Justice Harlan discussed the phenomenon of the burden of persuasion. He observed:

[A] standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. Although the phrases "preponderance of the evidence" and "proof beyond a reasonable doubt" are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions.

397 U.S. at 370, 90 S.Ct. 1068. See also *Addington v. Texas,* 441 U.S. 418, 423–25, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); 9 *Wigmore on Evidence* pp. 404–433 (Chadburn rev.1981); Kaplan, "Decision Theory and the Factfinding Process," 20 Stan. L.Rev. 1065, 1071–77 (1968).

▮▮▮▮▮▮▮ The burden of production, by contrast, has nothing to do with whether evidence **should be believed.** Its concern is with the logical pertinence of evidence, **if believed,** validly to establish a required conclusion. The *prima facie* or legally sufficient case requires some competent evidence which, **if believed and given maximum weight,** would establish all of the required legal elements of the tort, the breach of contract, the crime, etc.

That standard does not fluctuate with fluctuations in the burden of persuasion. To ratchet up the burden of persuasion with respect to an issue does not correspondingly ratchet up

the burden of production. If the burden of persuasion as to actual malice were raised yet again to the level of "beyond a reasonable doubt," the burden of production would remain unchanged. If the burden of persuasion were to soar to the level of "to a mathematical certainty," the burden of production would still remain unchanged.

To raise the burden of persuasion is to heighten the level of certainty with which a fact-finder should believe a proposition to be true. To raise the burden of production, by contrast, would be to add a legal element as to which there must be some minimal evidence. When it comes to production, the certainty of belief is already hypothesized as maximal. It is at the highest possible level and can go no higher. There is no interaction between the two burdens. The very different burdens are airtight compartments, and leakage should not be permitted from one into the other. What Darcars remorselessly and unrelentingly keeps telling us, therefore, about the "clear and convincing" persuasion requirement is utterly immaterial to the legal sufficiency issue before us.

### Adequacy of the Pleading

Relying on *Scott v. Jenkins*, 345 Md. 21, 690 A.2d 1000 (1997), Darcars contends that the complaint 1) did not adequately plead a claim for punitive damages and 2) did not adequately allege the required element of actual malice. We do not agree.

Darcars relies on the following language from *Scott v. Jenkins*, 345 Md. at 37, 690 A.2d 1000, to support its contention:

> [I]n order *to properly plead a claim for punitive damages, a plaintiff must make a specific demand for that relief* in addition to a claim for damages generally, *as well as allege,* in detail, *facts that,* if proven true, *would support the conclusion that the act complained of was done with "actual malice."* Nothing less will suffice.

(Emphasis supplied).

*Scott v. Jenkins, id.,* first requires that "a plaintiff must make a specific demand for [punitive damages] relief in addi-

tion to a claim for damages generally." At the end of Count II, charging "Conversion and Punitive Damages," Borzym demanded precisely what *Scott v. Jenkins* requires.

> WHEREFORE, *Plaintiff demands compensatory damages* against defendants in the fair and just sum of four thousand three hundred dollars ($4,300), *and punitive damages* in the amount of One Million Dollars ($1,000,000) plus costs and interest.

(Emphasis supplied).

The second requirement of *Scott v. Jenkins, id.,* is that the plaintiff "allege, in detail, facts that, if proven true, would support the conclusion that the act complained of was done with 'actual malice.' " The first eleven paragraphs of the complaint, expressly incorporated into the second count, narrate all the events surrounding the controversy in exquisite detail. Paragraphs 12 through 15, expressly charging unlawful conversion and claiming punitive damages, further allege "facts that, if proven true, would support the conclusion that the act complained of was done with 'actual malice.' "

12. The vehicle was wrongfully repossessed by Defendant, in violation of Plaintiff's property interest in the vehicle. *When the vehicle was wrongfully repossessed, plaintiff had valuable property in the vehicle, valued at approximately $1,800.* In addition, the vehicle was valued at $26,000. Plaintiff had provided valuable consideration for the purchase of the vehicle, and had done everything required by the contract.

13. Furthermore, the plaintiff provided a cash down payment of $2,500 in cash, given to Douglas Quander. Mr. Quander represented Defendant for the purpose of negotiating financing for the subject vehicle. *Acting in concert with Defendant, he converted the $2,500 down payment after taking the payment in cash.* Although the contract for sale acknowledges that Plaintiff paid $2,500 as a down payment, Defendant denies that Mr. Quander received the funds. *In essence, Mr. Quander and Defendant stole from Plaintiff*

*the $2,500 Plaintiff paid as a down payment upon the vehicle.*

14. *Defendant's actions described herein demonstrate actions taken with deliberation and planning. Defendant took the payment in cash,* failed to give Plaintiff a receipt and did so *with the intent to deny receipt of such payment and convert the funds.* In fact, Defendant failed to provide a copy of the contract to Plaintiff which evidenced the down payment, and did so only after Plaintiff returned the following day insisting that he be provided a copy. *Such actions are outrageous, and done with wanton disrespect for plaintiff, and automobile customers in general. Such actions are deceitful and dishonest, and were designed to convert money and property from plaintiff.*

15. *In regard to the laptop computer and CDs, Defendant* refused to permit Plaintiff to retrieve his property from the vehicle after it was wrongfully repossessed, and *refused to return the property to plaintiff* thereafter. *Defendant thereby wrongfully converted Plaintiff's personal property, with the intent to use Plaintiff's personal property for Defendant's personal gain.*

(Emphasis supplied).

That pleading, we hold, 1) adequately made "a specific demand for punitive damages" and 2) adequately alleged facts that would support a claim of actual malice in the conversion of 1) the $2,500 in cash that had been the down payment for the BMW; and 2) most especially, the laptop computer and the CD collection in the trunk of the BMW at the time of its repossession.

### Proof of Darcars's Healthy Financial Condition

After the jury returned its verdict of $4,300 in compensatory damages and further indicated that Borzym was entitled to punitive damages, Judge McGuckian conducted a hearing on the amount of the punitive damage award. Borzym called as his sole witness Robin Stein, Darcars's financial services director.

Ms. Stein testified she had held the position of financial services director since 1994 and received continuous training in the financial operation of a car dealership. She was unable to recite the average profit per vehicle but knew that the dealership sold between 1,500–2,000 new and used vehicles per year at prices ranging from $32,000 to $61,000 per car and that each sale carried an approximate 14% markup. The dealership was profitable in 1999 and 2000, had grown in staff and sales since 1994, and was financially sound. In argument, counsel extrapolated from the lowest ($4,000) to the highest ($8,500) markup on an estimated 1,000 new cars to arrive at an approximate annual gross profit of $6,250,000.

Virtually every case reviewing the amount of the award of punitive damages involves, directly or indirectly, the financial condition of the defendant and the ability of the defendant to pay the award. The purpose of punitive damages is not to bankrupt or impoverish a defendant, and a review of the defendant's financial condition is a matter of the utmost importance in both the jury's decision and the court's review of the award. *Fraidin v. Weitzman*, 93 Md.App. 168, 211–18, 611 A.2d 1046 (1992); *Bowden v. Caldor*, 350 Md. 4, 28, 710 A.2d 267 (1998). The amount of the award must relate to and not be disproportionate to the defendant's ability to pay. *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 242, 652 A.2d 1117 (1995); *Embrey v. Holly*, 293 Md. 128, 141–42, 442 A.2d 966 (1982).

We have no problem in concluding that the evidence showed that this luxury car dealership was a profitable and financially sound business. The pattern jury instruction utilized by the trial court called on the jury to award as punitive damages an amount that would deter the defendant and others from similar conduct, proportionate to the wrongfulness of the defendant's conduct and the defendant's ability to pay, but not designed to bankrupt or financially destroy the defendant. The ultimate award of $25,000 was supported by sufficient evidence of Darcars's financial condition to meet that criterion.

Even if Ms. Stein's testimony as to the financial soundness of Darcars were massively discounted, it would not make a dent in Darcars's ability to pay what was, for it, the relatively modest punitive damages award of $25,000. Not even counting its used car sales, Darcars sold approximately 1,000 new cars per year at prices ranging between $32,000 and $61,000 per car. The award of $25,000 was significantly less than the average retail price of a single one of those cars and the contention is ludicrous.

### The Cross–Appeal

Darcars filed a post-judgment Motion for Judgment Notwithstanding the Verdict and/or Motion for Remittitur. Following a hearing at which counsel for both parties gave oral argument, Judge McGuckian reduced the punitive damages award from $100,000 to $25,000.

I think that there were sufficient facts that the plaintiff presented from which the jury could have made an award of punitive damages. However, *I do think that there is a disproportionality between the amount of the compensatory award and the award for punitive damages.*

Therefore, I am going to reduce the amount of punitive damages to $25,000.

(Emphasis supplied).

There was no voluntary agreement by Borzym to a remittitur of $75,000 of the punitive damages award. There was no discussion of the possibility of a new trial, either as a threat to Borzym if he did not agree to the remittitur or as an option that Borzym might prefer to the court-ordered reduction. Procedurally, Judge McGuckian simply ordered the reduction in the amount of the award. Borzym has taken a cross-appeal challenging that reduction.

As we prepare to address the cross-appeal, several larger observations may help to place the immediate problem in a proper context. Although the precise issue before us, mercifully, seems firmly fixed, the surrounding context is in a state of flux.

## The Term "Remittitur"

The very term "remittitur" itself seems in recent years to be undergoing a significant semantic change, with attendant procedural consequences. Historically, a remittitur was the voluntary submission by a plaintiff to pressure brought on him by a trial judge. When, in response to a defendant's motion for a new trial and/or remittitur, the trial judge agreed that a jury's award of damages had been excessive, the trial judge could threaten to order a new trial unless the plaintiff agreed to "remit" that portion of the award that the judge deemed to be excessive. The reduction itself, however, could not occur unless the plaintiff agreed to it. The modality of reduction was the plaintiff's "voluntary" remission. In *Turner v. Washington Sanitary Commission*, 221 Md. 494, 501–02, 158 A.2d 125 (1960), Judge Henderson described the basic features and the lineage of the new trial/remittitur option.

> The trial practice of granting a new trial sought by the defendant, *unless the plaintiff remit* a portion of the verdict which the trial court deems excessive, is well established in Maryland. It is referred to without the citation of authority in 2 Poe, *Pleading and Practice* (Tiffany's ed.), § 347.

(Emphasis supplied). The Court of Appeals also explained, 221 Md. at 503, 158 A.2d 125, that the trial judge had not "usurped the jury's function" because the plaintiff enjoyed the unfettered option either to remit or to run the risk of a new trial.

> *The plaintiff is not obliged to remit.* He has the option of accepting the alternative and trying the case again.

(Emphasis supplied).

In *Conklin v. Schillinger*, 255 Md. 50, 64, 257 A.2d 187 (1969), Judge Barnes also made it clear that the act of remitting was one engaged in by the plaintiff.

> [T]he Maryland practice of granting a new trial by the trial judge in tort cases where the sole ground is an excessive

verdict, *unless the plaintiff remits the portion of the verdict which the trial court deems excessive,* is well established.
(Emphasis supplied).

In *Banegura v. Taylor,* 312 Md. 609, 624, 541 A.2d 969 (1988), Judge McAuliffe described the well-settled practice.

*A trial judge,* upon finding a verdict excessive, *may order a new trial unless the plaintiff will agree to accept a lesser sum fixed by the court.* The standard to be applied by a trial judge in determining whether a new trial should be granted on the ground of excessiveness of the verdict has been variously stated as whether the verdict is "grossly excessive," or "shocks the conscience of the court," or is "inordinate" or "outrageously excessive," or even simply "excessive." The granting or refusal of a remittitur is largely within the discretion of the trial court.

(Emphasis supplied).

In *Battista v. Savings Bank of Baltimore,* 67 Md.App. 257, 273, 507 A.2d 203 (1986), this Court also alluded to the fact that it was the plaintiff's option to accept or to reject the remittitur.

"A motion for judgment n.o.v. is not the way to get at excessive damages; that is *the office of a motion for a new trial which can be denied conditioned on the plaintiff's acceptance of a remittitur.*

(Emphasis supplied).

In *Baltimore Harbor v. Ayd,* 134 Md.App. 188, 199, 759 A.2d 1091 (2000), Judge Adkins also stressed that the reduction of the award is in the control of the plaintiff.

Technically speaking, in ordering a remittitur, a trial court does not reduce the verdict; rather, the court orders a new trial unless the winning party will agree to accept a lesser sum fixed by the court, instead of the jury verdict.

The traditional Maryland practice was completely in line with the definition of the term "remittitur" in *Webster's Third New International Dictionary* (1969):

1.a. a remission to a defendant by a plaintiff of the portion of a verdict for damages considered excessive by trial or appellate court;

b. the formal agreement or stipulation of the plaintiff waiving or releasing his right to receive such portion representing the excessive damages;

c. the direction or order of the court approving such stipulation and judgment for the reasonable portion of damages or ordering a new trial unless such remission is made by the plaintiff.

It was the fact that the plaintiff had agreed, albeit reluctantly, to the remittitur that, in the earlier case law, cast considerable doubt on the entitlement of a plaintiff to appeal from that remittitur. *Turner v. Washington Sanitary Comm'n,* 221 Md. at 505, 158 A.2d 125; *State, Use of Shipley v. Walker,* 230 Md. 133, 137–38, 186 A.2d 472 (1962); *Kneas v. Hecht Co.,* 257 Md. 121, 123–24, 262 A.2d 518 (1970); *Podolski v. Sibley,* 12 Md.App. 642, 647, 280 A.2d 294 (1971). Any doubt, however, as to the entitlement of an aggrieved plaintiff to challenge a reduction of his award, at least by way of a cross-appeal, was resolved when Chapter 428 of the Acts of 1990 amended Maryland Code, Courts and Judicial Proceedings Article, § 12–301, to add the following provision:

In a civil case, a plaintiff who has accepted a remittitur may cross-appeal from the final judgment.

And see *Baltimore Harbor v. Ayd,* 365 Md. 366, 375 n. 4, 780 A.2d 303 (2001); *Surratt v. Prince George's County,* 320 Md. 439, 458–61, 578 A.2d 745 (1990).

In *Bowden v. Caldor,* 350 Md. 4, 710 A.2d 267 (1998), the procedural landscape, at least with respect to punitive damages awards, was altered dramatically. More accurately, perhaps, it appeared to have been altered dramatically. The plaintiff in that case had suffered a court-ordered reduction of his punitive damages award from $9,000,000 to $350,000. He never agreed to the reduction and was given no option of a new trial as an alternative to the reduction. He challenged the procedure.

The plaintiff Bowden contends that a court cannot reduce, on the ground of excessiveness, a jury's award of punitive damages without giving the plaintiff the option of a new jury trial on punitive damages. According to Bowden, even if the $9,000,000 punitive damages award were excessive, the circuit court erred in reducing the award without granting him the option of a new jury trial.

350 Md. at 42–43, 710 A.2d 267.

Although acknowledging that "the normal Maryland practice" had been to give a plaintiff a new trial option, the Court of Appeals observed that the question of whether such an option is required was one of first impression.

[W]e have never discussed or decided whether a court's reduction for excessiveness of a punitive damages award must, under Article 23 of the Declaration of Rights, be accompanied by a new trial option. In fact, this Court has never decided the comparable issue with regard to *compensatory* damages. We have observed that, *under normal Maryland practice, a court's reduction of a compensatory damages award as excessive is ordinarily accompanied by a new trial option,* and that this practice does not violate Article 23. Nonetheless, we have never held that the new trial option is required, either with respect to punitive or compensatory damages.

350 Md. at 46, 710 A.2d 267 (emphasis supplied).

Drawing on the distinction that a compensatory damages award is based on fact-finding, whereas the "factors limiting the size of punitive damages awards ... are principles of law," Judge Eldridge conjectured as to the possible distinction between the respective procedural requirements of 1) reducing a compensatory damages award and 2) reducing a punitive damages award.

Assuming *arguendo* that, under Article 23 of the Declaration of Rights, a court ordinarily may not reduce, on the ground of excessiveness, a jury's *compensatory* damages award without giving the plaintiff the option of a new trial,

it would not follow that the same limitation is applicable to a jury's *punitive* damages award.

350 Md. at 46–47, 710 A.2d 267 (emphasis in original).

The holding of the Court of Appeals, 350 Md. at 47, 710 A.2d 267, was clear that the new trial option, although permitted, is not required.

> Consequently, we hold that Article 23 of the Declaration of Rights does not require a court, when it reduces a punitive damages award for excessiveness, to give the plaintiff the option of a new trial. Although the court, in its discretion, may grant a new trial option, it is not required to do so.

Although that holding, as one of first impression, may not literally have changed the law, it was a significant departure from the "normal Maryland practice" and from what many had assumed to be the law. Along with that apparent shift in the law has been a sea change in the word "remittitur" itself. In the Latin original, it was the third person singular passive voice of the verb "remittere" and meant, "It is remitted." The verb "remit" has traditionally referred to a volitional act by the plaintiff. To the extent to which it is no longer required that the plaintiff do any remitting, is the ordered reduction of an award by someone else still properly called a "remittitur?"

There does seem to be a creeping semantic shift in "remittitur" from a reference to a plaintiff's volitional act of agreeing to a reduction toward a reference to the overall reductive process itself. *Black's Law Dictionary* (7th ed.1999) now defines "remittitur" in terms of 1) the abstract reductive process itself or 2) the ultimate order of the court.

1. The process by which a court reduces or proposes to reduce the damages awarded in a jury verdict.

2. A court's order reducing an award of damages.

The subject who does the remitting seems to have shifted from the plaintiff to the trial judge. Absent an agreement by the plaintiff to the reduction, however, we will, as linguistic

conservatives, forgo using the term "remittitur" and speak instead simply of a court's reduction of an award.

## On the Issue of Reducing Punitive Damages, Plaintiff and Defendant Do Not Enjoy Equal Footing

Invoking the guidelines set out in *Bowden v. Caldor*, 350 Md. 4, 710 A.2d 267 (1998), for assessing the appropriateness of a punitive damages award, Borzym argues as if he, as plaintiff, enjoyed the same right to have his jury award **not reduced** as Darcars, as defendant, enjoyed to have the jury award **reduced.** Such is not the case. With respect to allegedly excessive punitive damages awards, a defendant, arguing for a reduction, enjoys numerous advantages not possessed by a plaintiff, arguing against a reduction.

The tilt in favor of the defendant is implicit in the very identification of the possible miscarriage under review. The perceived evil that is subject to the law's redress is an award that is **excessive,** not an award that is **inadequate,** either originally or after having been reduced by the trial judge. The only curative device contemplated by the law is the **reduction** of an award, not the **preservation** or **non-reduction** of an award. The latter is only a coincidental benefit to a plaintiff and not the primary focus of the reductive procedure.

As the law historically focused on the evil of excessive punitive damages awards, the common law of Maryland has always provided a defendant with the right to seek a reduction, initially from the trial court and, should that effort fail, from the appellate court. "[L]ike any award of damages in a tort case, the amount of punitive damages awarded by a jury is reviewable by the trial court for excessiveness." *Ellerin v. Fairfax Savings*, 337 Md. 216, 242, 652 A.2d 1117 (1995); *Bowden v. Caldor*, 350 Md. at 21, 710 A.2d 267. In line with the relatively recent Supreme Court decisions in *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *Honda Motor Co. v. Oberg*, 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994); and *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134

L.Ed.2d 809 (1996), Maryland now recognizes that a defendant also enjoys an additional constitutional right, under the Due Process Clause of the Fourteenth Amendment, not to be subjected to an excessive punitive damages award. *Alexander v. Evander*, 88 Md.App. 672, 709–15, 596 A.2d 687 (1991); *Bowden v. Caldor*, 350 Md. at 25–26, 710 A.2d 267.

To these common law and constitutional protections provided for a defendant against an excessive punitive damages award, there is no corresponding right in a plaintiff to receive an award. No matter how compelling a punitive damages award might seem to be under the facts of a given case, should the fact-finder for any reason opt against making such an award, the plaintiff has no redress. *Adams v. Coates*, 331 Md. 1, 15, 626 A.2d 36 (1993), established clearly that "the trier of fact has discretion to deny punitive damages even where the record otherwise would support their award." As Judge Eldridge pointed out in *Bowden v. Caldor*, 350 Md. at 25, 710 A.2d 267, "a plaintiff has no right or entitlement to punitive damages under Maryland law." He further noted, 350 Md. at 25 n. 8, 710 A.2d 267, that this is why a plaintiff enjoys no general right of "post verdict review" either from an allegedly inadequate award or from no award at all.

Because there is no right or entitlement to an award of punitive damages, and because a trier of fact is not required in any case to. award punitive damages, there is no post verdict review on the ground that the amount of the punitive damages award was inadequate.

### Punitive Damages As A "Civil Fine"

The lack of symmetry between the greater interest of a defendant in a reduction and the lesser interest of a plaintiff in a non-reduction is readily explainable, when it is remembered that the focus of an excessiveness review is on the defendant, on the appropriateness of punishing the defendant, on the impact of the award on the defendant. The plaintiff is little more than a sometimes lucky bystander to this punitive damages process. Theoretically, he has already received ev-

erything to which he is entitled in the form of the award for compensatory damages.

 The punitive damages award, except as a coincidental boon, is not designed to benefit the plaintiff. It is designed, rather, to benefit society generally by punishing a defendant, by way of what is regularly referred to as a "civil fine," for its malicious acts. See *Market Tavern v. Bowen*, 92 Md.App. 622, 636, 610 A.2d 295 (1992) ("Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tort feasor."). As *Alexander v. Evander* pointed out, 88 Md.App. at 715, 596 A.2d 687, punitive damages are designed "to punish the wrongdoer, to teach him not to repeat his wrongful conduct and to deter others from engaging in the same conduct."

 The award's appropriate severity, therefore, is measured not by any reference to a need or entitlement on the part of the plaintiff, but by its efficacy to deter a defendant from repeating such malicious acts and to deter others from committing similar malicious acts in the future. The total focus is on the defendant and the defendant's conduct.

The nature of a civil lawsuit, of course, is such that the plaintiff serves as society's instrumentality in pursuing the punitive damages aspect of the suit. The fact that the plaintiff will be the recipient of the punitive damages award is simply society's way of rewarding the plaintiff for serving as its agent for this punitive and deterrent mission. The boon to the plaintiff, however, is a coincidental benefit or incentive and not a core interest. The plaintiff simply does not have the same stake in the matter that the defendant has. Cases that measure excessiveness from a defendant's point of view are not, therefore, necessarily solid precedents in the very different appellate posture in which the plaintiff is raising a reverse contention.

### Reducing a Punitive Damages Award Does Not Constitute Fact–Finding

From the point of view of the plaintiff, however, there is a difference—a very significant difference—between 1) receiving

either no punitive damages award or an inadequate award from the jury in the first instance and 2) actually receiving an award from the jury but then suffering a reduction of that award at the hands of the trial judge. Historically, plaintiffs complained that such intervention by a trial judge, even in cases where the plaintiffs reluctantly agreed to a remittitur, constituted an interference with their right to trial by jury.

The historic complaint was that the judicial intervention compromised a plaintiff's expectation, pursuant to Article 23 of the Maryland Declaration of Rights, that the "right of trial by Jury of all issues of fact in civil proceedings ... shall be inviolably preserved." It was also argued, at least in terms of persuasive authority, that a judge's reduction ran afoul of the second clause of the federal Seventh Amendment, which states that "no fact tried by a jury, shall be otherwise re-examined in any court." *Bowden v. Caldor,* 350 Md. at 44–45, 710 A.2d 267.

 That doctrinal argument, however, was resolved, adversely to the plaintiffs' interests, by the analysis of Judge Eldridge in *Bowden v. Caldor,* 350 Md. at 46–47, 710 A.2d 267, that the "factors limiting the size of punitive damages awards ... are principles of law" and that "the court, in applying legal principles to reduce a jury's punitive damages award, is performing a legal function and not acting as a second trier of fact." A reduction of a punitive damages award by a trial judge does not, therefore, impinge on a plaintiff's right to trial by jury.

### Does a Plaintiff Have a Right to a Direct Appeal From a Judge's Reduction of a Jury's Punitive Damages Award?

A plaintiff, however, is not *necessarily* bereft of any right to appeal from a trial court's reduction of a jury's punitive damages award. What must be decided, and the law is far from clear on the subject, is 1) What right has an aggrieved plaintiff to a direct appeal (as opposed to a cross-appeal) from a court's reduction of a jury's award?; 2) What circumstances,

such as a voluntary remittitur, might compromise a plaintiff's right to appeal?; and 3) Granted the right to appeal, what would be the basis for such an appeal?

## A. "Inside the Box" of a Voluntary Remittitur

All of the early case law addressing appealability strongly suggested that a plaintiff had no right of direct appeal from a trial court's reduction of a jury's punitive damages award. To be sure, all of the cases were "inside the box" of a plaintiff's having voluntarily agreed to the remittitur by which the reduction was accomplished. Although *Bowden v. Caldor* stated, 350 Md. at 46, 710 A.2d 267, that Maryland had never "held that the new trial option is required, either with respect to punitive or compensatory damages," it acknowledged that "under normal Maryland practice, a court's reduction of a compensatory damages award as excessive is ordinarily accompanied by a new trial option." All of the cases touching on appealability involved 1) the extending of such an option and 2) a plaintiff's consequential agreement to a remittitur. Indeed, the appellate opinions clearly seemed to proceed from the assumption that the "normal Maryland practice" was the required practice.

In *Turner v. Washington Sanitary Comm'n*, 221 Md. at 505, 158 A.2d 125, the Court of Appeals held that the plaintiffs, by agreeing to the reduction, were precluded from challenging that reduction on appeal.

In the instant case we think *the plaintiffs, by accepting the lesser amount, are precluded from arguing that the trial court abused its discretion* in eliminating the amount which it deemed excessive, and that they are not entitled to have the jury's verdict reinstated. We think this holding is in accord with the great weight of authority.

(Emphasis supplied).

In *State, Use of Shipley v. Walker*, 230 Md. at 137–38, 186 A.2d 472, the Court of Appeals again stated:

[W]e have held, in accord with the great weight of authority, that *the plaintiffs' acceptance of the lesser amount is a bar to review.*

(Emphasis supplied).

In *Kneas v. Hecht Company,* 257 Md. at 125–26, 262 A.2d 518, the plaintiff not only agreed to a remittitur but also accepted payment. That incremental act, however, did not seem to be critical to his having "forfeited his right to review."

Having concluded in this case that the damages awarded were excessive and $5,000 would be adequate compensation for the incident, Judge Keating had the discretionary authority to give the plaintiff the option of accepting a reduced amount or a new trial. Once the plaintiff agreed to entry of judgment, accepted payment and caused the court records to be marked "Paid, Settled and Satisfied" the entire litigation came to a complete conclusion.

In *Podolski v. Sibley,* 12 Md.App. 642, 647, 280 A.2d 294 (1971), Judge Orth similarly observed for this Court:

Moreover, the Court of Appeals has held that *the plaintiff's acceptance of the lesser amount is a bar to review.*

(Emphasis supplied).

## B. An Amelioration in the Case of a Cross–Appeal

A double-barreled amelioration from the harshness of such review foreclosure occurred in 1990. On July 1, Chapter 428 of the Acts of 1990 amended Maryland Code, Courts and Judicial Proceedings Article, § 12–301 by adding the provision:

In a civil case, a plaintiff who has accepted a remittitur may cross-appeal from the final judgment.

The preamble to Chapter 428 recited that the bill was for "the purpose of authorizing a plaintiff who has accepted a remittitur in a civil case to cross-appeal from the final judgment of the circuit court."

On September 4, the judicial branch joined the legislative branch in the amelioration process, as the Court of Appeals filed its opinion in *Surratt v. Prince George's County,* 320 Md.

439, 458–61, 578 A.2d 745 (1990). Deeming them to be excessive, the trial judge ordered a remittitur of two compensatory damages awards. "In the event the plaintiffs did not accept the remittitur, the judge ordered a new trial on damages only." 320 Md. at 457–58, 578 A.2d 745. The plaintiffs reluctantly accepted the remittitur and cross-appealed, following an appeal by the defendant on other grounds.

The defendant argued that the plaintiffs, by accepting the remittitur, were barred from appealing the reductions in the awards. In writing for the Court of Appeals, Judge Adkins stressed the difference between the posture of the plaintiffs as appellants and their posture as cross-appellants.

> The County argues that *Maryland appellate courts have consistently held that "a Plaintiff's acquiescence in an Order for remittitur and acceptance of the lesser amount is a bar to appellate review.* What the County asserts is, in a sense, correct. The cases cited contain holdings to that effect. This seems to be the common law, and probably the majority rule, at least where unchanged by statute or rule of court. *See* Annotation, *Party's Acceptance of Remittitur in Lower Court as Affecting His Right to Complain in Appellate Court as to Amount of Damages for Personal Injury,* 16 A.L.R.3d 1327 (1967 & 1989 Supp.).
>
> We have explained the principle upon which the general rule in Maryland is based: "a voluntary act of a party which is inconsistent with the assignment of errors on appeal normally precludes that party from obtaining appellate review." In analyzing that explanation, we focus on the adverb "normally" for it suggests that under some circumstances the general rule may not apply. *The "normal" situations in which the rule precluding appeal has been invoked are those that involve an appeal by the plaintiff with none by the defendant.* That was the procedural posture in *Kneas, Walker,* and *Turner,* all *supra.* But that is not the procedural posture of the case before us, for *here the defendant appealed. Only after that had occurred did the plaintiffs cross-appeal. Thus the issue* here, as noted

by the Court of Special Appeals, *Surratt,* 80 Md.App. at 417 n. 2, 564 A.2d 95, *is one of first impression in Maryland.* 320 Md. at 458–59, 578 A.2d 745 (emphasis supplied).

Judge Adkins then analyzed the case law from around the country and the recognized principle that "the purpose of the remittitur procedure [is] to allow the plaintiff to choose between a reduced judgment on the one hand and the disadvantages involved in a new trial or an appeal on the other." 320 Md. at 459, 578 A.2d 745. An appeal by the defendant denies a plaintiff his advantage of repose and the overwhelming majority view of the national case law is that the plaintiff should not, in such a circumstance, be precluded from appellate counterpunching. The Court of Appeals adopted that position.

We find the logic of these cases persuasive. *The result they produce is fair,* and consistent with judicial economy, for *the rule they espouse tends to make a defendant who has benefitted from a remittitur think carefully before he or she notes an appeal. We hold that a plaintiff who has accepted a remittitur may cross-appeal if the defendant in the case has noted an appeal* at least when the plaintiff has not accepted payment of the reduced judgment and filed an order of satisfaction.

320 Md. at 461, 578 A.2d 745 (emphasis supplied).

It was the fortuitous status of an aggrieved plaintiff as a cross-appellant that permitted him to challenge a court-coerced remittitur in *Baltimore Harbor v. Ayd,* 134 Md.App. 188, 199, 759 A.2d 1091 (2000), and *Baltimore Harbor v. Ayd,* 365 Md. 366, 780 A.2d 303 (2001). In the Court of Appeals opinion, 365 Md. at 375 n. 4, 780 A.2d 303, Judge Battaglia noted this limited exemption from the foreclosure of an appeal.

*Although a plaintiff who accepts a remittitur would ordinarily be barred from seeking appellate review, see Kneas v. Hecht Company,* 257 Md. 121, 123–24, 262 A.2d 518, § 12–301 of the Courts and Judicial Proceedings Article of the Maryland Code (1974, 1998 Repl.Vol.) states that *"a plaintiff who has accepted a remittitur may cross-appeal from the final judgment." When BHC appealed the judg-*

*ment* of the Circuit Court to the Court of Special Appeals, *it opened the door for Ayd's cross-appeal. See Surratt v. Prince George's County* (holding that "a plaintiff who has accepted a remittitur may cross-appeal if the defendant in the case has noted an appeal).

(Emphasis supplied).

Absent an appeal by the defendant, even a massive reduction of a punitive damages award was not, and still may not be, appealable by the aggrieved plaintiff if he agreed to the remittitur rather than suffer a new trial.

## C. But What of Plaintiffs Who Are "Outside the Box"?

Until 1998, all of the appellate opinions discussing a plaintiff's entitlement to appeal a reduction of an "excessive" award involved situations "inside the box" of the plaintiff's either 1) having agreed voluntarily to a remittitur or 2) suffering a new trial as a consequence of not agreeing. In that year, the Court of Appeals decided *Bowden v. Caldor*. After acknowledging that it had "never discussed or decided this precise question with regard to an award of punitive damages," 350 Md. at 43, 710 A.2d 267, it held that "Article 23 of the Declaration of Rights does not require a court, when it reduces a punitive damages award for excessiveness, to give the plaintiff the option of a new trial," 350 Md. at 47, 710 A.2d 267. It thereby created for the first time, in practical effect if not in absolute theory, a totally new class of potentially aggrieved plaintiffs, who were "outside the box" of having acquiesced in a remittitur.

All of the pre–1998 case law concerning 1) the foreclosing of a right of direct appeal and 2) the limited exemption from that foreclosure in the context of a cross-appeal, therefore, had no pertinence to the case of plaintiffs who had not in any way agreed to or acquiesced in the court-ordered reduction of the awards. There was no articulated precedential rationale either for denying or for permitting appeals of reductions by such non-acquiescing plaintiffs. For non-acquiescing plaintiffs, Maryland was faced with a question that had never been addressed.

After holding that a trial court, "when it reduces a punitive damages award for excessiveness" is not required "to give the plaintiff the option of a new trial," *Bowden v. Caldor*, 350 Md. at 47, 710 A.2d 267, the Court went on to add that "the court, in its discretion, may grant a new trial option, [even if] it is not required to do so." If the trial court chooses to offer (threaten) a new trial and the plaintiff chooses a "voluntary" remittitur instead, the pre-*Bowden v. Caldor* rationale foreclosing a plaintiff's direct appeal (with its limited exemption from foreclosure in the case of the cross-appeal) would appear to be unchanged.

### *Bowden v. Caldor* Did Not Address Appealability

It might be suggested that *Bowden v. Caldor* itself is a *sub-silentio* decision that direct appeals by non-acquiescing plaintiffs are permissible, but a close look at the case history refutes any such suggestion. An award of punitive damages at an earlier trial had been vacated and remanded to the trial court for "the sole purpose of calculating punitive damages" based on three rather than five predicate offenses. *Caldor v. Bowden*, 330 Md. 632, 663, 625 A.2d 959 (1993). At the retrial, the "recalculating" petit jury upped the punitive damages award from $350,000 to $9,000,000. Believing that the mandate from the Court of Appeals established, as a matter of law, a $350,000 "cap" on the subsequent award, the trial judge accordingly reduced the award to that amount. The plaintiff had not been asked to agree to any remittitur.

On direct appeal by the plaintiff, this Court, in an unpublished opinion, affirmed the reduction by the trial judge. *Bowden v. Caldor*, No.2056, September Term, 1994 (filed May 15, 1996). This Court was initially troubled by the "procedural irregularity" of the trial judge's reduction of the verdict without having offered the plaintiff the option of a new trial, but ultimately concluded that the mandate of the Court of Appeals obviated the need for that normal option.

Initially, we address a procedural irregularity in the trial court's entry of the reduced judgment in this case. *Ordi-*

*narily, remittitur is an option offered to plaintiffs to avoid a new trial when the trial judge has found the verdict returned by the jury to be excessive. E.g., Banegura v. Taylor,* 312 Md. 609, 624, 541 A.2d 969 (1988). In the instant case, the trial judge simply "granted" a remittitur, without providing appellant the option of either accepting the remittitur or having a new trial ordered. Ordinarily, we would have grave doubts about the constitutionality of such action, given the right to trial by jury in civil cases contained in Article 23 of the Maryland Declaration of Rights. *See Turner v. Washington Suburban Sanitary Comm'n,* 221 Md. 494, 503, 158 A.2d 125 (1960) (While holding practice of remittitur constitutional, the Court opined that one of the primary reasons therefor was that *"[t]he plaintiff is not obliged to remit. He has the option of accepting the alternative and trying the case again."*). Nevertheless, because of the prior mandate of the Court of Appeals, the case at bar stands on different ground. According to the high Court's mandate, when read in conjunction with its opinion, the sole purpose of the April 1994 proceeding was for the jury to recalculate punitive damages on the basis of three torts, rather than five.

(Emphasis supplied).

This Court treated the court-ordered reduction at issue not as a new reduction of a new award on the merits of its excessiveness but simply as a legal application of the terms of the mandate.

[B]ecause a punitive damage award on retrial in excess of what was awarded in the original trial is inconsistent with the mandate and opinion of the Court of Appeals, then it necessarily follows that there would be no constructive purpose for the trial court to offer appellant the choice between remittitur and a new trial because no matter how many new trials were given, a verdict over $350,000 would not be permitted to stand. Therefore, we conclude that while it was perhaps error, in the technical sense, for the trial judge to "grant" a remittitur, rather than providing it

to appellant as an alternative to a new trial, it was non-prejudicial error under the particular facts of this case.

After noting that "the [trial] court repeatedly discussed the constraints of the prior mandate throughout the retrial proceedings, which it believed compelled the remittitur," we concluded that there was no "abuse of discretion in granting the remittitur in this case, especially in light of the prior mandate."

On *certiorari*, the Court of Appeals concluded that both this Court and the circuit court had 1) applied and articulated an erroneous principle of law and 2) misinterpreted the mandate of the Court of Appeals.

Both the Court of Special Appeals and the circuit court erred in holding that, because of the earlier appeal, the punitive damages award after a new trial could not exceed $350,000.

350 Md. at 19, 710 A.2d 267.

No issue as to the entitlement of the plaintiff to appeal the reduction was before the Court of Appeals in its *Bowden v. Caldor* and there was no discussion whatsoever as to that subject. It was, moreover, this Court, and not the Court of Appeals, that had entertained the appeal in the first instance, albeit with misgivings and only because we believed the unusual circumstances of the earlier mandate required it. The Court of Appeals had no choice but to correct what it believed to have been a serious misinterpretation of the law by this Court.

To attempt to resolve a hitherto unresolved issue of appealability, therefore, by positing an arguably *sub silentio* decision by this Court in an unpublished opinion under bizarre procedural circumstances would be the height of irresponsibility. Thus, even after *Bowden v. Caldor*, we were still looking at a clean slate as to the standing of a plaintiff, who has not agreed to a voluntary remittitur, to appeal from a court-ordered reduction.

Two years after *Bowden v. Caldor*, however, this Court decided *Zachair v. Driggs*, 135 Md.App. 403, 762 A.2d 991

(2000). In *Zachair*, an aggrieved plaintiff raised a number of issues and the defendants filed a cross-appeal. Among the issues raised by the plaintiff was a challenge to the court-ordered reduction of his punitive damages award without his having been given the option of a new trial as an alternative to the reduction. In a footnote, 135 Md.App. at 413 n. 6, 762 A.2d 991, we took passing notice of the new-trial-option question.

The court did not offer Zachair the option of a new trial rather than remittitur of the punitive damages award, and neither party suggests that it was required to do so. *See generally Bowden v. Caldor.*

We did not discuss appealability and did not recognize any issue with respect to it. We did, to be sure, entertain the appeal on that issue. The precedential significance, if any, however, of perhaps purely inadvertent appellate behavior is always highly tenuous. The appealability of a court-ordered reduction of a punitive damages award by a non-acquiescing plaintiff remains a legitimate question that deserves to be consciously addressed.

### A Non–Acquiescing Plaintiff May Appeal a Court–Ordered Reduction

The question may now be squarely before us. Borzym does not enjoy any special appellate entitlement by virtue of his status as a cross-appellant as far as the case law is concerned. Neither *Surratt v. Prince George's County*, 320 Md. 439, 458–61, 578 A.2d 745 (1990), nor *Baltimore Harbor v. Ayd*, 365 Md. 366, 375 n. 4, 780 A.2d 303 (2001), is helpful to him. Those cases (and, indeed, all of the appeal-foreclosure cases and all of the foreclosure-exemption cases) were focused on the significance of a plaintiff's having voluntarily agreed to a remittitur. In this case, Borzym took no such potentially foreclosing action.

It is more problematic, however, whether Borzym enjoys any special appellate entitlement pursuant to Courts and Judicial Proceedings Article, § 12–301. That section, by its very terms, might seem to be limited to "a plaintiff who has

accepted a remittitur." Borzym never accepted a remittitur and was never asked to do so. On the other hand, common sense would strongly suggest that the Legislature in 1990 intended to extend this right of appeal, if it were necessary to do so, to aggrieved plaintiffs generally and simply failed to anticipate, eight years prior to *Bowden v. Caldor,* that there could ever be a class of plaintiffs who had suffered a reduction without having agreed to a remittitur. The phrase "who has accepted a remittitur" could, in 1990, have been intended merely to be descriptive of all plaintiffs, and not a limitation to a special sub-category of plaintiffs. It would make little sense to permit even acquiescing plaintiffs to appeal, while denying such a right to plaintiffs who had not acquiesced.

■ In any event, in this case Borzym enjoys the unquestioned right to raise his present complaint. The present complaint is, after all, being raised by way of cross-appeal. It may be that the source of Borzym's right is § 12–301. But even if, *arguendo,* that should not be the case, we would not hesitate to hold that a plaintiff who has not voluntarily agreed to a remittitur has the right to appeal from a court-ordered reduction of a jury's punitive damages award. We would further hold that the basis for such an appeal would be a claim that the trial court abused its discretion in reducing the award either in the way or in the amount that it did.

▪ ■ It stands to reason that a plaintiff who has been awarded punitive damages by a jury would have the right, if he has not otherwise waived it, not to have that award, or even a significant part of it, taken away by the trial court in some arbitrary or heavy-handed fashion. Although the earlier case law focused more on excessiveness claims by defendants than on objections to reductions by plaintiffs and frequently focused on the new trial aspect of the new trial-remittitur option, the common denominator theme was that the trial court's actions could be reviewed for an abuse of discretion.

**The Standard of Appellate Review: Abuse of Discretion**

The statement of the Court of Appeals in *Mezzanotte Construction Co. v. Gibons,* 219 Md. 178, 183, 148 A.2d 399 (1959),

that the trial court's actions are "largely discretionary" strongly implies that there may be abuses of that discretion.

It is generally recognized that a trial court may pass an order for a new trial, unless the plaintiff shall remit a part of a verdict which the court deems excessive. The granting or refusal of such an order is largely discretionary with the trial court.

The wording of *Leizear v. Butler,* 226 Md. 171, 178, 172 A.2d 518 (1961), that the discretionary actions of a trial court will "rarely" be reviewed on appeal also suggests that they may *sometimes* be reviewed.

[W]hatever may be the rule elsewhere, we find it firmly established in Maryland that whether the claim be of excessiveness or inadequacy the action of the trial court in allowing or refusing a new trial will rarely, if ever, be reviewed on appeal.

In *State, Use of Shipley v. Walker,* 230 Md. 133, 137, 186 A.2d 472 (1962), the Court of Appeals equated the "extraordinary circumstances" that permit appellate review with "an abuse of discretion."

Little need be said as to the claim that the court erred in ordering a remittitur upon finding that the verdict in the administrator's suit was excessive. The granting or refusal of such an order is largely discretionary with the trial court. It is well settled that the granting or refusal of a new trial, conditional or otherwise, is *not reviewable except under extraordinary circumstances. We find no abuse of discretion in the instant case.*

(Emphasis supplied).

Although *State, Use of Shipley v. Walker* equated "extraordinary circumstances" with "abuse of discretion," the awkward phraseology or linguistic hiccough of *Conklin v. Schillinger,* 255 Md. 50, 68, 257 A.2d 187 (1969), and some of the cases that followed its refrain, seemed to make "extraordinary circumstances" an incremental requirement, which is, of course, an absurdity.

We agree that an abuse of discretion may be reviewed by us "under extraordinary circumstances" but we do not agree

with the contention that the trial court abused its discretion in this case.

An actual abuse of discretion is *ipso facto* an "extraordinary circumstance." Otherwise, we would be distinguishing between non-reviewable ordinary abuses of discretion and reviewable extraordinary abuses of discretion. That is just so much mumbo-jumbo. Once the case law goes on automatic pilot and begins the incantation of a honored mantra, however, one might as readily try to edit the Twenty-third Psalm.

In *Banegura v. Taylor*, 312 Md. 609, 624, 541 A.2d 969 (1988), the Court of Appeals reiterated.

A trial judge, upon finding a verdict excessive, may order a new trial unless the plaintiff will agree to accept a lesser sum fixed by the court. *The granting or refusal of a remittitur is largely within the discretion of the trial court.* We have said that *an abuse of that discretion may be reviewed by an appellate court* "under extraordinary circumstances."

(Emphasis supplied).

In *Alexander v. Evander*, 88 Md.App. at 717, 596 A.2d 687, this Court picked up the awkward but mercifully harmless refrain that,

although the granting or refusal of a remittitur is largely within the discretion of the trial court, *"an abuse of that discretion may be reviewed by an appellate court* 'under extraordinary circumstances.' " (quoting *Banegura v. Taylor*, 312 Md. 609, 624, 541 A.2d 969 (1988)).

(Emphasis supplied).

In *Franklin v. Gupta*, 81 Md.App. 345, 362, 567 A.2d 524 (1990), we similarly stated that, "because of the broad range of discretion accorded the trial judge, the decision [to order a new trial unless a remittitur is agreed to] is reviewable, on an abuse of discretion standard, only 'under extraordinary circumstances.' " See also *Baltimore Harbor v. Ayd*, 134 Md. App. 188, 199, 759 A.2d 1091 (2000).

██ However awkwardly or redundantly it has been phrased, what emerges is that the decision of a trial court to

reduce a punitive damages award, absent any agreement to the reduction by the plaintiff, is reviewable on an abuse of discretion standard. It was in *North v. North*, 102 Md.App. 1, 13–14, 648 A.2d 1025 (1994), moreover, that Chief Judge Wilner fully explicated the broadly deferential nature of that standard:

> "Abuse of discretion" is one of those very general, amorphous terms that appellate courts use and apply with great frequency but which they have defined in many different ways. It has been said to occur "where no reasonable person would take the view adopted by the [trial] court," or when the court acts "without reference to any guiding rules or principles." It has also been said to exist when the ruling under consideration "appears to have been made on untenable grounds," when the ruling is "clearly against the logic and effect of facts and inferences before the court," when the ruling is "clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result," when the ruling is "violative of fact and logic," or when it constitutes an "untenable judicial act that defies reason and works an injustice."

> There is a certain commonality in all of these definitions, to the extent that they express the notion that *a ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling. The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.*

(Emphasis supplied).

### The Varying Appellate Postures of the Cases Reviewing Questions of Excessiveness

### A. Defense Motions for Reductions Denied: No Abuses of Discretion

Most of the appellate case law dealing with the amount of a punitive damages award is not helpful to Borzym's challenge

to the reduction in this case. More frequently than not, the cases involve a claim by a defendant either 1) that it was erroneously denied a reduction of an excessive award or 2) that even a reduced award was still excessive. In both *Market Tavern v. Bowen,* 92 Md.App. 622, 610 A.2d 295 (1992) and *Merritt v. Craig,* 130 Md.App. 350, 746 A.2d 923 (2000), the defendants moved for the trial judges to reduce allegedly excessive jury awards of punitive damages. In both cases the motions for a reduction were denied. In both cases this Court held that the failure of the trial judges to reduce the awards did not constitute an abuse of discretion.

Neither of those cases is helpful to Borzym, because our holdings that reductions were not, as a matter of law, compelled by no means suggested that, had the trial judge in his discretion granted the requested reduction, such a reduction would, as a matter of law, have constituted an abuse of discretion. A trial judge is not forbidden to do everything that he is not compelled to do. Were it otherwise, by definition there would be no discretion. That is why a case in an opposite appellate posture, even when dealing with similar subject matter, is frequently meaningless as precedent.

## B. Even Reduced Award Still Excessive: Abuse of Discretion

In *Alexander v. Evander,* 88 Md.App. 672, 596 A.2d 687 (1991), the defendant moved for a reduction of a punitive damages award and a reduction was granted. On appeal, the defendant nonetheless claimed that, even as reduced, the award was still excessive. This Court agreed, vacated the award, and remanded for a new hearing under appropriate, constitutional guidelines.[4]

---

4. In both *Fraidin v. Weitzman,* 93 Md.App. 168, 611 A.2d 1046 (1992) and *VF Corporation v. Wrexham Aviation,* 112 Md.App. 703, 686 A.2d 647 (1996), defendants had requested reductions and the requests were denied by the trial judges. This Court vacated the awards and remanded for new hearings under 1) appropriate evidentiary rulings and 2) appropriate constitutional guidelines. Neither case is pertinent to our present analysis.

## C. Reductions Challenged by Plaintiffs: No Abuse of Discretion

In three cases, requested reductions in allegedly excessive awards were granted by trial judges and plaintiffs challenged the reductions on appeal. In each case, this Court held that the reduction of the award was not an abuse of discretion. *Franklin v. Gupta,* 81 Md.App. 345, 362, 567 A.2d 524 (1990); *Baltimore Harbor Charters v. Ayd,* 134 Md.App. 188, 198–204, 759 A.2d 1091 (2000); *Zachair v. Driggs,* 135 Md.App. 403, 415–25, 762 A.2d 991 (2000). Self-evidently, these cases are of no assistance to Borzym on his cross-appeal.

## D. No Reduction For Excessiveness Has Ever Been Deemed an Abuse of Discretion

We have found no case, and Borzym points us to none, in which a trial court has ever been held to have abused its discretion in granting to a defendant a reduction in the amount of an allegedly excessive punitive damages award.

The gist of Borzym's argument is that the original jury award of $100,000 "was not excessive" and that, had Judge McGuckian allowed it to stand, he would not have been in error. Granting, *arguendo,* that that be true, it does not establish that Judge McGuckian was in error in reducing the award. The fat bell-shaped curve of discretionary reductions embraces a broad, broad spectrum of reductions that are permitted even though they would not, as a matter of law, be compelled. As long as he acted on a rational basis, Judge McGuckian had the discretion to reduce the award or not to reduce the award without abusing that discretion, whichever way he went.

### The *Bowden v. Caldor* Guidelines

██ *Bowden v. Caldor,* 350 Md. at 26–41, 710 A.2d 267, discussed at length a number of "legal principles ... applicable to judicial review of punitive damages awards for excessiveness" as "principles of Maryland common law." 350 Md. at 26, 710 A.2d 267. Although the "list [was] not intended to

be exclusive or all-encompassing," 350 Md. at 41, 710 A.2d 267, and although the principles were aimed at reviewing possible excessiveness from a defendant's point of view, they are nonetheless relevant in determining whether a trial court was acting on the basis of reasonable considerations when it actually reduced an award.

*Bowden v. Caldor* also made it clear that its analysis was pursuant to Maryland common law principles and not constitutional due process.

> *[T]he legal principles discussed below,* applicable to judicial review of punitive damages awards for excessiveness, *are set forth as principles of Maryland common law.* Although some of these principles may be the same as requirements imposed by other courts as a matter of constitutional law, we have no reason at this time to consider minimum constitutional requirements in this area.

350 Md. at 26–27, 710 A.2d 267 (emphasis supplied).

 We will allude to those *Bowden v. Caldor* principles that are pertinent to the reduction in this case. One factor is "the degree of heinousness" of the defendant's conduct.

> [S]imply because the defendant has engaged in some "heinous" or "egregiously bad conduct" does not necessarily justify a large award of punitive damages. Under Maryland law, engagement in such conduct is a prerequisite for *any* award of punitive damages. Accordingly, in determining whether the amount of the award is disproportionate to the gravity of the defendant's conduct, it is the degree of heinousness which is important.

350 Md. at 27, 710 A.2d 267 (emphasis in original).

In assessing heinousness, the Court of Appeals found it significant that the defendant's "wrongful conduct was not life threatening" and that the plaintiff did not suffer "permanent physical injury" or "serious lasting effects."

> As heinous as it was, Caldor's malicious and wrongful conduct was not life threatening or the type of conduct which would likely lead to permanent physical injuries.

There was no evidence in the record that the plaintiff has suffered any serious lasting effects from the events.

350 Md. at 42, 710 A.2d 267. Darcars's conduct in this case was "not life threatening." Borzym suffered neither "permanent physical injuries" nor "serious lasting effects."

Another factor is the need for deterrence based on the continuing nature of the defendant's malicious conduct.

[R]epeated or frequent misconduct of the same nature, misconduct of long duration, attempts to conceal or cover-up the misconduct, failure to take corrective action, and similar circumstances, support the deterrence value of a significant award. "In the absence of a history of noncompliance with known statutory requirements, there is no basis for assuming that a more modest sanction would not have been sufficient to motivate" proper conduct by the defendant.

350 Md. at 29–30, 710 A.2d 267. In this case, there was no evidence of "frequent misconduct of the same nature" by Darcars, of "misconduct of long duration," or of a "history of noncompliance with known statutory requirements."

A third consideration, albeit of only marginal pertinence to this case, is a comparison of the punitive damages award (the "civil fine") with the maximum fine that could be imposed for comparable criminal conduct, in this case, theft. Although "the criminal fine for similar misconduct is not very pertinent" in cases "where the principal sanction [for the crime] is imprisonment," 350 Md. at 31, 710 A.2d 267, it does throw some light on the appropriate size of the punitive damages award. Maryland Code, Art. 27, § 342(f) imposes a maximum criminal fine for grand theft of $1,000. The original "civil fine" in this case, before it was reduced, was 100 times the maximum criminal fine.

*Bowden v. Caldor*, 350 Md. at 31, 710 A.2d 267, also noted that "[a]nother appropriate consideration in judicially reviewing an award of punitive damages is to compare the award with other final punitive damages awards in the jurisdiction...." In *Alexander v. Evander*, 88 Md.App. at 720, 596 A.2d 687, Chief Judge Wilner, after surveying all of the

punitive damages awards reflected in the appellate case law of Maryland, had noted, "Most of the punitive awards to date have been well under $100,000."

Perhaps the most significant factor considered by *Bowden v. Caldor*, 350 Md. at 38–41, 710 A.2d 267, was the relationship between the compensatory damages and the punitive damages.

> Whether a punitive damages award bears a reasonable relationship to the compensatory damages awarded in the case, is today generally accepted as a factor to be considered in judicial review for excessiveness of a jury's punitive damages award. We agree that this should be a consideration when a court reviews an award of punitive damages for excessiveness.

350 Md. at 39, 710 A.2d 267. The Court of Appeals also noted, 350 Md. at 40 n. 11, 710 A.2d 267, the general relevance, at least as a rough guideline, of treble damage statutes as throwing some light on the appropriate size of a punitive award.

> Although courts in cases not controlled by statutory provisions have not regularly drawn analogies to such treble damage statutes, nonetheless we believe that the three to one ratio frequently appearing in statutory provisions is some indication of public policy concerning the relationship of monetary punishments to actual damages.

Before the reduction in this case, the punitive damages were slightly over 23 times as great as the compensatory damages. It was this "disproportionality between the amount of the compensatory award and the award for punitive damages" that Judge McGuckian referred to as his primary reason for ordering the reduction. Even after the reduction, the punitive damages were still almost six times as great as the compensatory damages. In reducing the punitive damages award against Darcars from $100,000 to $25,000, Judge McGuckian did not abuse his discretion.

**JUDGMENT AFFIRMED; COSTS TO BE ASSESSED TWO–THIRDS TO APPELLANT/CROSS–APPELLEE**

AND ONE–THIRD TO APPELLEE/CROSS–APPEL-
LANT.